URBAN REDEVELOPMENT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 70412. Filed August 15, 1960.

*Fred R. Tansill, Esq.*, and *Louis Hoppe, Esq.*, for the petitioner.
*Frank W. Hardy, Esq.*, for the respondent.

TRAIN, *Judge:* The Commissioner determined the following deficiencies in income and excess profits taxes:

| Fiscal year ended Sept. 30— | Amount |
| --- | --- |
| 1954 | $41,654.11 |
| 1955 | 4,294.26 |

The only question for decision is whether petitioner is entitled to carry over net operating losses incurred in prior years against earnings realized in its fiscal years ended September 30, 1954, and September 30, 1955.

846

Some of the facts have been stipulated and are so found.

The petitioner is a New York corporation, organized on October 16, 1949. Its principal office was in New York City until July 14, 1953. Thereafter, its principal office was located at 309 Cameron Street, Alexandria, Virginia. Petitioner filed its tax returns for the taxable years ended September 30, 1954, and September 30, 1955, with the district director of internal revenue at Richmond, Virginia.

Paragraph second of petitioner's certificate of incorporation sets forth the purposes for which petitioner was formed. These purposes, in general, were to buy, sell, lease, construct, or otherwise deal in real and personal property; to operate a general real estate agency; to deal in building materials and goods; to deal in bonds and mortgages; to buy and sell and otherwise deal with stocks and bonds of other corporations; to purchase or otherwise acquire the assets of other businesses; and to conduct the aforementioned activities throughout the United States.

Petitioner's certificate of incorporation, as amended, authorized it to issue and it did issue at par prior to May 20, 1953, the following shares:

| Number of shares | Stock | Par value per share of stock |
|---|---|---|
| 1,245 | Preferred | $100.00 |
| 60,000 | Common | .01 |

Prior to May 20, 1953, Fred F. Stoneman (sometimes hereinafter referred to as Stoneman) acquired all of the 60,000 authorized, issued, and outstanding common shares of the petitioner.

Between the date of original formation and September 30, 1951, Fred F. Stoneman acquired all of the 1,245 authorized, issued, and outstanding preferred shares of petitioner.

Between the time of formation of petitioner and May 20, 1953, Stoneman loaned various sums to it and on the latter date petitioner issued to Stoneman a demand promissory note with interest at 6 per cent, which note was in the face amount of $5,321.26 and intended to cover the loans.

Petitioner incurred net operating losses (before adjustment necessary, under section 122 of the Internal Revenue Code of 1939, to determine the proper net operating loss carryover) for the years indicated in the following amounts:

| Fiscal year ended Sept. 30— | Amount of net operating loss |
|---|---|
| 1950 | $55,006.15 |
| 1951 | 74,815.11 |
| 1953 | 378.35 |

During the fiscal year ended September 30, 1952, petitioner was inactive and had neither net profit nor net loss. Petitioner remained inactive until May 20, 1953.

Randolph Rouse (sometimes hereinafter referred to as Rouse) has been engaged as a land developer and builder in Virginia since early 1947. He is the principal stockholder and dominant personality in several construction corporations. Through a mutual acquaintance, Joseph Rosenbaum, Rouse was introduced in 1953 to Allen Thurman, a resident of Arlington, Virginia. Thurman was acting as agent for Fred Stoneman in respect of the sale of Stoneman's stock in petitioner.

Thurman introduced Rouse to Stoneman and negotiations for the sale of stock of petitioner were carried on by all three individuals. Thurman stated to Rouse, in the course of the negotiations, that the petitioner had certain assets. Among the assets that petitioner was alleged to have were certain plans for the construction of multiple-unit dwelling houses. A letter dated June 20, 1950, from Eugene Greenhut (sometimes hereinafter referred to as Greenhut) to petitioner, was shown to Rouse. This letter indicated that certain architectural plans, specifications, and other related data for a proposed housing project in Boston, Massachusetts, were conveyed to petitioner for an adjusted price of $21,000, receipt of which was acknowledged. It was further stated in the letter that Greenhut owned "complete preliminary plans, specifications and other related data" on a proposed housing project in Kansas City and that he, Greenhut, agreed to sell, and the petitioner agreed to buy, the described plans, specifications, and other data for $30,000.

Greenhut, in addition to having prepared the aforementioned plans, was at some time prior to May 20, 1953, an officer and director of and a minority stockholder in petitioner.

Rouse knew that petitioner had not engaged in any construction activity from the time of its organization to the time he considered purchase of its stock in 1953 and that it had been engaged exclusively in promotional work. He knew that petitioner had not used any plans which it may have owned for the purpose of actual construction.

Rouse did not utilize the services of any of his professional advisors, including his architect, in verifying the existence and value of the assets allegedly owned by petitioner. He did not see any plans, drawings, or specifications before he purchased the stock of petitioner. He did see, however, certain rough sketches known as "renderings."

Rouse never attempted to purchase the aforementioned plans, drawings, specifications, and other related data from petitioner.

In the course of negotiations, Thurman represented that petitioner had operating losses. Rouse was advised of the years in which these losses were sustained and their amount. Rouse had his certified public accountant go to New York for the purpose of examining the books of petitioner. His accountant verified the books and net operating losses of petitioner "to almost the dollar." Rouse also had his attorney, Paul D. Brown, verify the legal existence of petitioner.

On or about May 20, 1953, Randolph Rouse purchased from Fred F. Stoneman all of the preferred and common shares of petitioner together with its note payable to Stoneman, described above, for the sum of $12,250.

The balance sheet of petitioner as of May 20, 1953, was as follows:

| *Assets* | | *Liabilities and net worth* | |
|---|---|---|---|
| Organization expense | $400 | Notes and accounts payable | $6, 882. 15 |
| | | Capital stock | 125, 000. 00 |
| | | Surplus (deficit) | (131, 582. 15) |
| | 400 | | 400. 00 |

During the period from May 20, 1953, to the end of the fiscal year ended September 30, 1953, the petitioner had the following income and expenses:

| | | |
|---|---|---|
| Income: Discounts earned | | $991. 79 |
| Expenses: | | |
| Taxes (payroll) | $802. 86 | |
| Accounting and legal | 486. 00 | |
| Miscellaneous expenses | 56. 70 | |
| Office supplies | 18. 94 | |
| Bank charges | 5. 64 | |
| | | 1, 370. 14 |
| Loss | | 378. 35 |

On July 14, 1953, petitioner was qualified to do business in Virginia. During the taxable years ended September 30, 1954, and September 30, 1955, petitioner engaged in the construction and sale of detached residential property in the area around Arlington County, Virginia. This construction activity was on lots acquired by petitioner from a land development corporation controlled by Rouse.

Petitioner computed its net income using the completed contract basis for its construction activities and otherwise used the cash receipts and disbursements method of accounting.

Subsequent to his acquisition of the stock of petitioner, Rouse, as president of petitioner, made certain efforts to secure possession of the plans, specifications, and drawings represented to be the property of petitioner. On February 15, 1954, Rouse wrote a letter to Stoneman in which he recited the representation by Thurman that

certain plans were the property of petitioner and would be delivered to Rouse in connection with his purchase of the stock and Rouse requested that Stoneman make the plans available immediately. On March 9, 1954, Rouse wrote a letter to Greenhut, again reciting the representation by Thurman that the assets of petitioner included architectural plans, specifications, and other related data for proposed projects in Boston and Kansas City, Missouri, and that the plans, specifications, and other data were in Greenhut's possession. Rouse stated in this letter that the plans, specifications, and other data were then urgently needed for a project and that Greenhut should advise Rouse as to whether and when the data could be picked up.

Rouse next conferred with the attorney he had retained for petitioner, Paul D. Brown. On April 5, 1954, Brown wrote a letter to Greenhut, indicating that he, Brown, was the attorney for petitioner and making formal demand on Greenhut for the architectural plans, specifications, and other related data. Greenhut did not comply with the demand made in this letter.

Neither petitioner nor Rouse ever obtained possession of the plans and specifications other than a few miscellaneous files and plats of no value.

No suit was ever brought by petitioner to recover the plans, specifications, and other data allegedly the property of petitioner.

Rouse acquired, after October 8, 1940, control of petitioner by a purchase of all of its outstanding stock from Stoneman.

Rouse's principal purpose in acquiring this stock was the avoidance of Federal income tax by securing the benefit of deductions, namely, for net operating losses incurred by petitioner in the years 1950 and 1951, which he would otherwise not have enjoyed.

### OPINION.

The respondent has argued alternatively that certain net operating losses are not allowable to petitioner in its fiscal years 1954 and 1955 because either (1) the petitioner is not the same taxable entity within the meaning of section 122(b)(2)(B) of the Internal Revenue Code of 1939, or (2) its sole shareholder acquired control of petitioner for the principal purpose of avoiding Federal income tax by securing the benefit of a net operating loss deduction, a benefit which he would not otherwise have enjoyed but for acquiring that control.

We have recently decided that it does not matter whether the actual deduction which produces the benefit is claimed by the acquiring person or the acquired corporation. In either event, if the principal purpose for the acquisition is the avoidance of tax, section 129

of the Internal Revenue Code of 1939 [1] or section 269 of the Internal Revenue Code of 1954 applies. *Thomas E. Snyder Sons Co.*, 34 T.C. 400 (1960).

Although Rouse testified that his principal purpose was not to obtain control of the petitioner for its net operating losses but to acquire certain architectural plans, specifications, and drawings, his actions in connection with the acquisition of the stock compel a different conclusion.

Rouse admitted that he had never made any attempt to purchase the plans, specifications, and drawings from the petitioner. In the early stages of negotiation, he retained his certified public accountant to check out the losses of petitioner "to almost the dollar" and his attorney to verify its legal existence. Not only did he neglect to seek professional advice as to the value of the sole asset of petitioner he was allegedly most interested in, i.e., the plans, specifications, and drawings, but he did not even see these plans before he consummated the deal. In fact, Rouse never did see the plans, specifications, and drawings, for they were never produced.

The fact that the corporation itself had been unsuccessful in arranging for the construction of buildings based on the alleged plans lends no support to Rouse's claim that he, an experienced builder, had as a primary purpose the acquisition of those plans. Petitioner has introduced no evidence showing that the man who allegedly prepared the plans, Greenhut, was a qualified architect; that Greenhut had a reputation in the building community for competence and ability; or that Rouse believed that Greenhut had such a reputation so that he could form a belief that plans prepared by Greenhut would be of considerable value notwithstanding the lack of success of petitioner up to that time in translating those plans into constructed buildings.

We have not overlooked Rouse's efforts, as president of petitioner, to obtain possession of the plans subsequent to his acquisition of the stock. Petitioner, however, did not bring suit against Greenhut, who allegedly had possession of the plans, for the reason Rouse viewed him as a "slippery character." Rouse's attorney testified that Rouse was not interested in filing suit.

Petitioner has introduced no evidence that, upon discovering that he was not going to be able to obtain the assets for which he alleg-

---

[1] SEC. 129. ACQUISITIONS MADE TO EVADE OR AVOID INCOME OR EXCESS PROFITS TAX.

(a) DISALLOWANCE OF DEDUCTION, CREDIT, OR ALLOWANCE.—If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation, * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * * [So far as here applicable, section 269 of the 1954 Code contains no substantial change.]

edly purchased the stock of the corporation, he investigated the feasibility of either rescinding his contract with Stoneman for the purchase of the stock or effecting an adjustment of the purchase price to reflect the fact that petitioner did not have, and apparently would never have, what was allegedly its most valuable asset, the plans and specifications.

Rouse testified that he had three reasons for acquiring petitioner. The first was that he considered the plans and specifications to be well worth the money that he was paying for the stock. The second was that he was obtaining 100 per cent of an already existing corporation which meant that he would not be troubled by two other people, namely, incorporators required by State law, holding a small part of the stock. The third was that the petitioner had a favorable tax position in that it had a tax loss. On the basis of all the evidence, we conclude that petitioner has not established that Rouse's principal purpose in acquiring its stock was other than to obtain the benefit of its net operating losses. Accordingly, we have found that Rouse's principal purpose in acquiring all of the stock of petitioner was to avoid Federal income tax by securing the benefit of a deduction which he would otherwise not have enjoyed. Having so found, both section 129 of the 1939 Code and section 269 of the 1954 Code require the disallowance of the net operating loss carryover.

In view of our findings and of the applicability of section 129 of the 1939 Code and section 269 of the 1954 Code, it is not necessary to discuss respondent's contention that the losses should not be allowed for the reason that petitioner is not the same taxable entity, within the meaning of section 122(b)(2)(B) of the 1939 Code, as the taxable entity which incurred the losses.

*Decision will be entered under Rule 50.*