Brown Dynalube Company, Inc. v. Commissioner.
Brown Dynalube Co. v. Commissioner
Docket Nos. 78916, 83469.
United States Tax Court
T.C. Memo 1961-46; 1961 Tax Ct. Memo LEXIS 302; 20 T.C.M. (CCH) 255; T.C.M. (RIA) 61046; February 23, 1961
*302 The evidence establishing that the principal purpose for the acquisition of control of petitioner was the avoidance of income tax, held, net operating loss carryover and interest deductions are disallowed. Sec. 129, 1939 Code; Sec. 269, 1954 Code. Held, further, upon showing the amount of losses involved, petitioner is entitled to a net operating loss carryback from years which are not in issue and with respect to which the Court is without jurisdiction to determine tax liability. William Thomas Minor, Jr., Esq., Johnston Bldg., Charlotte, N.C., for the petitioner. Richard C. Forman Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in the income tax of the petitioner as follows: Docket No.
Year
Deficiency
78916
1954
$9,976.44
78916
1955
4,603.39
83469
1956
410.08
The issues to be decided are as follows: (1) Is the petitioner entitled to carry over net operating losses incurred in prior years to the years 1954 and 1955? (2) Is petitioner entitled to interest deductions for amounts paid and accrued during the years 1954, 1955 and 1956 on its 6 percent subordinated debentures? (3) Is the petitioner entitled *304 to carryback losses from the years 1956, 1957 and 1958 to the years 1954 and 1955? Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. E. S. Dillard (hereinafter referred to as Dillard) and Jean T. Dillard, are husband and wife residing in Lynchburg, Virginia. With respect to the taxable years 1954 and 1955, the Dillards resided in Charlotte, North Carolina, and filed joint income tax returns with the district director of internal revenue, Greensboro, North Carolina. Dillard is an executive associated principally with corporations engaged in the manufacture of paper boxes and cartons. During the years 1954 and 1955 and continuously since those years, he has been president of the Old Dominion Box Company, Inc., a Virginia corporation with its principal office in Lynchburg, Virginia; the Valley Board Corporation, a West Virginia corporation engaged in the manufacture of paperboard products; Dacam Corporation, a North Carolina corporation engaged in the manufacture of equipment for packaging cartons and paper boxes; and Palmetto Box Company, a South Carolina corporation of Greenville, South Carolina, engaged in the manufacture of paper box products. *305 Petitioner, Brown Dynalube Company, Inc. (hereinafter called Dynalube) was organized under the laws of the State of North Carolina on May 11, 1950, as Brown Distributing Company, Inc. Its certificate of incorporation was amended to change its name to Brown Dynalube Company, Inc., in July 1950. For the years in question, corporation tax returns were filed with the district director of internal revenue, Greensboro, North Carolina. From the time of its organization until September 15, 1959, the outstanding capital stock of Dynalube consisted of four shares of $100 par value common stock. The two original stockholders of Dynalube were E. H. Newcombe (hereinafter referred to as Newcombe) and D. M. Coddington (hereinafter referred to as Coddington), both of Charlotte, North Carolina. Newcombe and Coddington each owned two shares of Dynalube's common stock. Newcombe was elected the first president of Dynalube and he has served continuously in such capacity and is currently president of Dynalube. Newcombe has, however, drawn no compensation or commissions of any type from Dynalube since 1951. Dynalube originally was the exclusive sales agent for grease guns or lubricating devices manufactured *306 by William Young Brown (hereinafter referred to as Brown) who held and still holds patents for these devices. Brown was later employed by Brown Dynalube Manufacturing Company (hereinafter referred to as the partnership) which was a partnership owned equally by Newcombe and Coddington. The partnership then replaced Brown as manufacturer of the grease guns and lubricating devices, and Dynalube continued as the exclusive sales agent for the new manufacturer. Dynalube itself held no grease gun patents and had no manufacturing plant, assembly lines, or other manufacturing equipment. The business of Dynalube proved unprofitable and for the years 1950 to 1953, inclusive, reported net operating losses as follows: Year
Loss
1950
$40,607.55
1951
30,945.77
1952
5,994.72
1953
550.54
As of September 30, 1953, Dynalube was indebted to the partnership to the extent of $77,477.46. In its fiscal year ended September 30, 1953, the partnership wrote this amount off as a bad debt on its books and return. The deduction was allowed in full by the Internal Revenue Service when and as claimed by the partnership and the individual partners. C. C. Coddington, Inc., was a corporation *307 owned equally by Coddington and his brother. As of December 31, 1953, Dynalube was indebted to C. C. Coddington, Inc., in the amount of $4,455.64. When C. C. Coddington, Inc., was dissolved on December 1, 1954, this indebtedness was charged off on the corporate books as a bad debt. As of December 31, 1953, Dynalube was indebted to four other creditors as follows: Amount
Name of Creditor
Owed
Charlotte Metal Processing Company
$ 54.73
Mayer, Barber and Spigener
517.10
Washburn Printing Company
450.00
McDonald Insurance Agency
216.83
TOTAL
$1,238.66
On February 26, 1954, the partnership was dissolved. In connection with the dissolution, Newcombe and Coddington, for moral reasons, assumed personal liability for the said debts, which Dynalube owed to the four creditors referred to in the preceding paragraph. On May 7, 1954, Newcombe and Coddington, as partners, paid these debts through their attorney. On December 31, 1953, Newcombe, acting individually and as a partner in the partnership, assigned to Eleanor Meares, (hereinafter referred to as Meares), agent for W. T. Minor, Jr., all of his claims against Dynalube in return for one dollar. On the same *308 day, Newcombe endorsed his certificate for two shares of Dynalube stock over to Meares. On May 7, 1954, Coddington acting individually, as a partner in the partnership, and as president of C. C. Coddington, Inc., assigned to Meares all of his and the corporation's claims against Dynalube in return for one dollar. On the same day Coddington endorsed his certificate for two shares of Dynalube stock over to Meares. On May 15, 1954, Meares entered into a contract with Dillard which recited that "in consideration of the sum of One Dollar" she was assigning all her "right, title and interest in any assets and any of the following claims, she being the owner of the said claims upon the following persons: (a) Notes and accrued interest of C. C. Coddington, Inc. of
$3,935.00
(b) Accounts of C. C. Coddington, Inc. of
$460.64
60.00
Other accounts payable trade from
Charlotte Metal Processing Company
54.73
Mayer, Barber and Spigener
517.10
Washburn Printing Company
450.00
McDonald Insurance Agency
216.83
1,759.30
Accounts payable Brown Dynalube Manufacturing Company, a Part-
nership
77,477.46
TOTAL
$83,171.76" In the same contract, Meares also *309 assigned to Dillard four shares of stock in Dynalube which was all its outstanding stock On May 15, 1954, Dillard entered into a contract with Dynalube, which recited that in return for the issuance to him of 6 percent subordinated debentures (hereinafter referred to as Dynalube bonds) with a face value of $85,000, Dillard was assigning and transferring to Dynalube all claims he held against Dynalube totaling $83,171.76, plus the sum of $1,828.24. On the same date, Dynalube issued to Dillard a stock certificate representing the four outstanding shares of Dynalube stock. On or about May 20, 1954, Dynalube issued to Dillard a series of 6 percent debenture bonds in the face amount of $85,000, with a maturity date of May 15, 1974. The following balance sheet shows the financial condition of Dynalube on May 20, 1954, after the issuance of the bonds but before acquisition of certain packaging machines from Dacam Corporation: BALANCE SHEET #1
May 20, 1954
ASSETS
Cash in bank
$ 1,828.24
Office furniture and fix-
tures
$ 2,070.03
Reserve for deprecia-
tion
(512.84)
1,557.19
Accounts receivable - other
207.16
Goodwill
3,355.01
TOTAL ASSETS
$ 6,947.60
LIABILITIES
6% subordinated debentures due
May 15, 1974
$85,000.00
NET WORTH
Capital stock issued
$ 400.00
Surplus (deficit)
(78,452.40)
(78,052.40)
TOTAL LIABILITIES AND
NET WORTH
$ 6,947.60
*310 Through a series of charitable donations commencing in December of 1954, and concluding in November 1958, Dillard divested himself of all the Dynalube bonds. By September 15, 1959, all of such bonds had been acquired by Massie Construction Corporation, a company owned by the family of W. T. Minor, Jr., attorney for the petitioner. On its income tax returns, Dynalube deducted, as interest, the following amounts with respect to those Dynalube bonds having a face value of $85,000: Interest
Year
Deduction
1954
$3,187.50
1955
5,100.00
1956
5,100.00
Dacam Corporation (hereinafter called Dacam) was incorporated on September 26, 1947, under the laws of the State of North Carolina. Its principal business is manufacturing equipment for packaging cartons and paper boxes. Since 1954, Dillard has been president and controlling stockholder of Dacam. In 1952, Dacam extended its business of leasing automatic packaging machines to various west coast packagers. From the time Dacam went into operation in the west coast area until May of 1954, it had been successful in getting 32 of its 200 D automatic packaging machines placed at various locations under lease and royalty *311 agreements. In May of 1954, Dillard borrowed $90,000 from the American Trust Company and loaned the funds to Dynalube. As security for this loan, Dillard received from Dynalube a note and chattel mortgage on 32 Dacam 200 D packaging machines. The note and chattel mortgage were then pledged by Dillard as security with the bank for its loan to him. In May of 1954, Dynalube used the funds which it borrowed from Dillard to purchase, from the Dacam Corporation, 32 Dacam 200 D packaging machines, the same machines on which Dynalube gave a chattel mortgage to Dillard. The machines were those located on the west coast (California). The purchase price was $84,499.26, which was Dacam's depreciated cost or book value of the machines. The remainder of the funds borrowed from Dillard was used by Dynalube as operating capital in its business. The following balance sheet shows the financial condition of Dynalube on May 20, 1954, immediately after the aforesaid loan and the purchase of 32 Dacam 200 D packaging machines: BALANCE SHEET #2
May 20, 1954
ASSETS
Cash in bank (deposits in transit)
$ 7,328.98
Packaging machines (security for note to E. S. Dillard)
84,499.26
Office furniture and fixtures
$ 2,070.03
Less reserve for depreciation
(512.84)
1,557.19
Accounts receivable
207.16
Goodwill
3,355.01
TOTAL ASSETS
$ 96,947.60
LIABILITIES
Notes payable - E. S. Dillard 3% due in installments of $3,000 begin-
ning July 1, 1954, plus interest secured by Chattel Mortgage on 32
packaging machines
$ 90,000.00
6% subordinated debentures due May 15, 1974
84,000.00
TOTAL LIABILITIES
$175,000.00
NET WORTH
Capital stock issued
$ 400.00
Surplus (Deficit)
(78,452.40)
[78,052.40)
TOTAL LIABILITIES AND NET WORTH
$ 96,947.60
*312 Later in 1954, Dynalube purchased from Dacam Corporation eight additional 200 D packaging machines for book value. In order to facilitate this purchase, Dynalube borrowed $18,000 directly from the American Trust Company on a note endorsed by Dillard and secured by a chattel mortgage on the aforementioned packaging machines. On December 8, 1954, Dillard purchased from Dynalube an additional Dynalube bond having a face value of $2,500 for $2,500 cash. After acquiring the packaging machines from Dacam, Dynalube maintained two offices, one in Charlotte, North Carolina, in the Dacam Building, and one at 799 Stevens Street, San Francisco, California; however, the California office was closed in December 1956. While Dacam was operating on the west coast, the mechanic assigned to its west coast office was Charles Sinclair. When Dacam sold its west coast packaging machines to Dynalube, Sinclair continued to act as the serviceman for these machines, but as an employee of Dynalube rather than Dacam. At about the time Dynalube purchased Dacam's west coast packaging machines, Dillard sent David Conrad to San Francisco to supervise Dynalube's west coast operations. Prior to the time Conrad *313 went to the west coast, he was an employee of Dacam. Grover Currie, the inventor of the Dacam 200 D automatic packaging machine, was a salaried employee of Dacam, both before and after Dacam sold its west coast packaging machines to Dynalube. Although he was an employee of Dacam, from 1954 to 1956, Currie was in charge of Dynalube's Charlotte office and served as an officer and director of Dynalube. After the sale of the packaging machines to Dynalube, Newcombe remained the president of Dynalube. However, he never went to the west coast; he was not connected with and really never understood Dynalube's packaging machine operations; and he did not know and never had met Conrad, Charles Sinclair, or any of Dynalube's west coast employees. Both before and after May 1954, Newcombe's only source of income was and has been from his employment as a salesman for the Old Dominion Box Company, Inc., a corporation of which Dillard is president and general manager, and which his family controls. During the years 1953-1956, inclusive, Dynalube had no grease gun sales. However, in 1954 and 1955, Dynalube did realize a profit from its west coast operations. As a result, for the year 1954 Dynalube *314 had net income of $26,574.88 and for the year 1955 it had net income of $10,244.62. The grease gun sales for 1957, 1958 and for a portion of 1959 were as follows: Year
Amount
1957
$2,570.21
1958
2,687.79
1959 (9 months)
5,327.31
Before Dacam sold its west coast packaging machines to Dynalube, it neither solicited competitive bids on such machines nor advertised such machines for sale in trade publications. Some west coast bottlers did wish to purchase the Dacam packaging machines but Dacam declined to sell to them. Dacam had other packaging machine divisions in Colorado, Montana and Washington, but it did not divest itself of these operations. After the sale of packaging machines to Dynalube, Dacam continued in the same business but did not operate on the west coast. For its fiscal year ended September 30, 1953, Dacam reported net income of $82,241.54, but for its fiscal year ended September 30, 1954, Dacam reported net income of only $22,788.83. In about 1951, Robert Gair Company, Inc., became a licensee of a number of Dacam automatic packaging machines. In April of 1956 Dacam entered into a negotiated agreement with Robert Gair Company, Inc., which provided *315 that the latter would have the option to purchase all the Dacam 200 D machines then in its possession for $4,250. Also in 1956, Dacam sold a similar machine for $4,250 and in 1957 for $4,750. In August 1959, Dynalube sold all of its automatic packaging machines to the Old Dominion Box Company, Inc. This sale was effected at a price of $43,500 which was $5,764.97 less than the book value of such machines. The sales price was approximately equal to the current total liabilities of Dynalube as of December 31, 1958. On September 1, 1959, Dillard gave his four shares of Dynalube stock to Newcombe. Since that time Dillard has had no connection with Dynalube. At the time that Dillard gave his stock away, he knew that large grease gun contracts were pending with the procurement agencies of the Army and the Navy. On September 15, 1959, Massie Construction Corporation exchanged its Dynalube bonds with a face value of $87,500 for 875 shares of Dynalube's common stock. On the same date Dynalube issued to Newcombe a new certificate representing his four shares of Dynalube's common stock. Dynalube's Federal income tax returns for the calendar years 1956, 1957 and 1958 showed losses of $3,846.55, *316 $12,910.61 and $11,034.44, respectively. During each of those years, Dynalube continued to make payments of $5,100, as interest, on its bonds having a face value of $85,000. For the purpose of a net operating loss carryback, the petitioner had losses of $7,810.61 and $5,934.44 in 1957 and 1958, respectively. E. S. Dillard, an individual, acquired ownership of all the stock of petitioner after October 8, 1940. Dillard's principal purpose for acquiring control of petitioner was to evade or avoid Federal income tax. The Commissioner determined that "the corporation is not entitled to the [deductions] claimed." Opinion Issue 1 Respondent contends that certain net operating losses sustained in the years 1950 to 1953, inclusive, are not allowable to petitioner in its calendar years 1954 and 1955 (1) because the petitioner is not the same taxable entity, within the meaning of section 122(b)(2)(B) of the Internal Revenue Code of 1939, that sustained the losses, and (2) because its sole shareholder acquired control of petitioner for the principal purpose of avoiding Federal income tax by securing the benefit of the net operating loss deduction, a benefit which he would not otherwise *317 have enjoyed but for acquiring that control. The petitioner contends and Dillard testified that the principal purpose in acquiring the stock of Dynalube was not to avoid taxes. The evidence does not support this contention. It is not of controlling importance whether the actual deduction which produces the benefit is claimed by the acquiring person or the acquired corporation. In either event, if the principal purpose for the acquisition is the avoidance of tax, section 129 of the Internal Revenue Code of 1939[1] or section 269 of the Internal Revenue Code of 1954 applies. Thomas E. Snyder Sons Co., 34 T.C. 400 (1960); Urban Redevelopment Corporation, 34 T.C. 845 (August 15, 1960).
*318 In order to prove that the principal purpose of the acquisition of Dynalube was not tax avoidance, petitioner primarily seeks to establish that the principal purpose was acutally of a business nature, namely, the promotion of Dynalube's grease gun business. Dillard testified that it was the combination of the grease gun as "a top flight product" and the talent of Newcombe in the sales field that attracted him to the acquisition. The evidence is to the contrary. There were no grease gun sales from the time Dynalube was acquired in 1954 until 1957; nor is there evidence that any real effort was made to make such sales. Dillard's alleged confidence in Newcombe as a promoter of the grease gun business is belied by the fact that Newcombe, ostensibly president of Dynalube (without compensation), was occupied full-time as a box salesman for the Old Dominion Box Company, Inc. Newcombe testified that such efforts as he made to promote grease gun sales were on his own spare time. There is testimony concerning plans for manufacturing but, aside from self-serving testimony, there is no evidence of such plans. Indeed, Dynalube held no patents and had no manufacturing facilities. Dillard testified *319 that a large Government order for grease guns was anticipated, but we know that, when such an order finally became pending in 1959, he gave away his stock. Before he did so, Dynalube sold all the packaging machines to the Old Dominion Box Company, Inc., a company owned by Dillard and his father. As additional non-tax-avoidance factors which supposedly entered into the acquisition decision, Dillard testified that Dacam needed the money and that the west coast packaging machines were sold to Dynalube in order to avoid possible anti-trust violations by putting the leasing of the machines into a separate corporate entity. With regard to the latter contention, the evidence shows that Dacam had other divisions in Colorado, Montana, and Washington of which it did not divest itself. There is no explanation of why only the California machines would be involved in a possible antitrust action. Petitioner has offered us no real evidence other than testimony concerning certain alleged "advice" which would lend substance to the anti-trust argument; nor has it explained the reason for placing the machines in a loss corporation in that connection. With respect to Dacam's need for money for expansion, *320 Dillard testified that two competitors wanted to buy the machines, but that Dacam did not want to sell to either because the other would then be lost as a licensee. However, he failed to explain, if all the west coast machines were to be sold, what difference that would make to Dacam, since it would no longer have any business there in any event. Dillard also testified that neither prospective purchaser would pay over book value for the machines; however, no competitive bids were sought from other companies. At the time Dynalube purchased the original 32 machines, they had a book value of approximately $84,000 or about $3,000 per machine. The fact that Dillard was able to borrow $90,000 from a bank, using these machines as collateral, would indicate a value in excess of book value. Moreover, our findings set forth subsequent sales (where the machines were several years older) at prices up to $4,750. The evidence does not bear out petitioner's contention that the sale was made because of Dacam's need for money. We deem it unnecessary to dwell on the later developments involved here - the fact of the sale by Dynalube of all the machines in 1959 to another Dillard corporation, the fact *321 that the sale was at less than the then book value and approximately equalled Dynalube's current liabilities as of December 31, 1958, and the fact that thereafter Dynalube was again little more than a corporate shell. The petitioner has failed completely to establish that the principal purpose of the acquisition was not tax avoidance. We are satisfied that Dillard was not investing in the net operating losses of Dynalube. The entire record discloses a taxavoidance scheme to transfer profit-making machinery to a loss corporation, with other ancillary tax benefits. On the basis of all the evidence we have found that Dillard's principal purpose in acquiring all the stock of petitioner was to avoid Federal income tax by securing the benefit of a deduction he would otherwise not have enjoyed. Having so found, both section 129 of the 1939 Code and section 269 of the 1954 Code require the disallowance of the net operating loss carryover. Issue 2 The respondent has disallowed petitioner's interest deductions claimed with respect to the 6 percent debenture bonds in the face amount of $85,000. [2]
*322 Our findings make clear the fact that Dillard acquired the debentures for a nominal consideration; that Dillard was Dynalube's sole owner; that there was only $400 in stock outstanding; that the debentures were subordinated specifically to all bank loans. Under similar circumstances, such advances have been considered contributions to equity capital, subject to the risks of the business, rather than loans. However, we need not decide that question in view of our recent decision in Army Times Sales Company, 35 T.C. 688 (January 31, 1961). In that case, under almost identical facts, we stated: In Thomas E. Snyder Sons Co., 34 T.C. 400, and Urban Redevelopment Corporation, 34 T.C. 845 (Aug. 15, 1960), this Court decided that section 129, Internal Revenue Code of 1939, and section 269, Internal Revenue Code of 1954, are applicable to deny the benefit of a net operating loss deduction even though the person acquiring control of a corporation was not the taxpayer directly claiming the corporation's loss carryovers, where it was *323 found that the principal purpose for the acquisition was tax avoidance by securing the benefit of a deduction which such person would not otherwise enjoy. In the instant proceedings, if the acquisition of control was made for the purpose of tax avoidance, the cited cases are direct authority for disallowing the corporate petitioner's claimed deductions for net operating losses incurred prior to the acquisition. Further, assuming the requisite intent or purpose and assuming that the promissory note represented a valid [found to have been worthless] outstanding indebtedness at the time of Ryder's acquisition of the note and control of the corporate petitioner, we are of the opinion that the cited cases are authority for disallowing Sales Company's claimed deductions for interest on debenture bonds issued in substitution for such note, for the reason that they fall into the same category as the net operating losses in serving as the basis for securing the benefit of a deduction which the acquiring person would not otherwise enjoy but for such acquisition. Since we have found that Dillard's principal purpose in acquiring Dynalube was to avoid Federal income taxes, we hold that petitioner *324 is not entitled to interest deductions for amounts paid and accrued on the Dynalube bonds in the years 1954, 1955, and 1956. Army Times Sales Company, supra.
Issue 3 Petitioner contends that even if the net operating loss carryovers from the years 1950 to 1953, inclusive, are disallowed, it should be allowed to carry back losses sustained in the years 1956, 1957, and 1958. We believe that petitioner is entitled to carry back its losses, but not in the full amounts claimed. We have decided that Dynalube was not entitled to deduct, as interest, amounts paid and accrued on its 6 percent subordinated debentures, having a face value of $85,000. In determining the amount of the loss, for each year, to be carried back, the foregoing determination must be taken into consideration. After giving effect to that adjustment, the year 1956 will show a profit and the losses shown in the years 1957 and 1958 will be reduced by $5,100 for each year. Respondent contends that the years 1957 and 1958 are not before the Court and we agree. However, the Court has jurisdiction to consider facts *325 in other years in order to determine the amount of the deficiency for the years properly before it. Sec. 6214(b), 1954 Code; Akeley Camera & Instrument Corp., 18 T.C. 1045 (1952); Greenleaf Textile Corp., 26 B.T.A. 737 (1932). The respondent also maintains that he has not audited the later years and that there is no proof of the losses. The amounts of the losses shown on the income tax returns for the years 1956, 1957, and 1958 are stipulated. The financial statements for the years 1957 and 1958 are part of the record. The petition placed the respondent on notice of the carryback claim. The respondent asserts no error in the determination of the later years' losses, except in the case of the interest deductions with respect to which we agree an adjustment of the losses must be made. Under these circumstances, we believe the petitioner is entitled to the carrybacks in question, reduced as hereinbefore set forth. Decisions will be entered under Rule 50. Footnotes
1. SEC. 129. ACQUISITIONS MADE TO EVADE OR AVOID INCOME OR EXCESS PROFITS TAX. (a) Disallowance of Deduction, Credit, or Allowance. - If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation, * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * * [So far as here applicable, section 269↩ of the 1954 Code contains no substantial change.]
2. The respondent has not disallowed interest on the $2,500 bond purchased by Dillard for $2,500 on December 8, 1954.↩