The Huddle, Inc. v. Commissioner.
Huddle, Inc. v. Commissioner
Docket No. 72071.
United States Tax Court
T.C. Memo 1961-150; 1961 Tax Ct. Memo LEXIS 200; 20 T.C.M. (CCH) 745; T.C.M. (RIA) 61150; May 25, 1961
*200 Prior to October 31, 1952, petitioner operated a snack bar and beer business in Athens, Georgia, at a loss. N & N Cafeteria, Inc., operated a cafeteria on the floor above petitioner. Davis acquired all the stock of Huddle and N & N from Butts and another on October 31, 1952, at which time Huddle had been closed for 6 months. Huddle immediately began operating a new cafeteria in Atlanta, Georgia, under a lease and equipment previously acquired by Davis, and several months later also acquired another cafeteria in Atlanta which Davis had been operating successfully as a sole proprietor. Huddle's business in Athens was not reactivated. Held, Davis' principal purpose in acquiring petitioner's stock was to avoid tax by securing the benefit of a deduction, credit, or allowance which he would not otherwise enjoy and petitioner may not deduct in its fiscal years 1954 and 1955 the net operating losses incurred by petitioner prior to the change in ownership of its stock. Sec. 129, I.R.C. 1939, and sec. 269, I.R.C. 1954. Elliott Goldstein, Esq., Citizens & Southern National Bank Bldg., Atlanta, Ga., and William J. Linkous, Esq., for the petitioner. James E. Johnson, Jr., Esq., for the respondent. DRENNEN
Memorandum Findings of *202 Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioner's income tax for the fiscal years ending February 28, 1954 and 1955, in the amounts of $4,990.79 and $4,738.81, respectively. The only question for decision is whether petitioner is entitled to carry over and deduct from income net operating losses sustained by it prior to October 31, 1952, when the ownership of all of petitioner's stock and the location of its business activities changed. Findings of Fact Some of the facts are stipulated and are so found. Petitioner is a Georgia corporation incorporated on March 20, 1947, as the Huddle, Inc. (hereinafter referred to as Huddle). Its corporation income tax returns for the fiscal years ending February 28, 1954 and 1955, were filed with the director of internal revenue for the district of Georgia. Petitioner's charter states that the general nature of its business is the "buying, selling and dealing in candies, soft drinks and other beverages, confectioneries, notions, cigars, * * * including the right to operate a restaurant and the sale of all sorts and types of food products; * * *" The original stockholders were Wallace Butts (hereinafter *203 referred to as Butts), Henry Keller, Woodrow Keller, and William Keller. These stockholders were each issued 50 shares of common stock of a par value of $100 per share in exchange for cash. On February 6, 1948, Butts acquired all the stock owned by the Kellers, thereby becoming sole stockholder of Huddle. From 1948 to 1952, Huddle's business was located in the basement of the premises known as 171 College Avenue in Athens, Georgia. This space was occupied by Huddle under a sublease from N & N Cafeteria, Inc. (hereinafter referred to as N & N), a corporation whose stock was owned by Butts and E. D. Newton, for a part of the space and a lease presumably from the owner of the building for a part of the space. N & N operated a cafeteria in the same building on the floor above Huddle. Huddle's business in Athens, which was primarily that of serving beer, sandwiches, and short orders, resulted in a profit during the first year of operation, but in subsequent years it consistently lost money. For a period of at least 6 months prior to the sale of the stock to A. T. Davis (hereinafter referred to as Davis) on October 31, 1952, the business was completely closed down. Huddle reported net *204 operating losses for each fiscal year ending during the period 1948 to 1952, inclusive, and in the fiscal year 1953 a loss was sustained prior to October 31, 1952. The reported net operating losses for the fiscal years 1951, 1952, and 1953 were $14,809.44, $12,322.39, and $5,300.16, respectively. Butts became anxious to dispose of Huddle and N & N and in August or September 1952, Johnny Smith, a mutual friend of Butts and Davis, contacted Davis asking if he would be interested in purchasing the restaurant and cafeteria owned by Butts. Davis had been in or associated with the restaurant business in and around Atlanta, Georgia, for some 30 years. In 1952 he owned and operated a number of restaurants and cafeterias. Prior to his acquisition of the Huddle stock, all of his businesses were operated as proprietorships, and none of them had ever sustained operating losses. Before 1952, Davis had been advised by his attorney that he should incorporate his businesses to facilitate estate planning, to limit his personal liability, and to ease the transfer of his businesses should he desire to sell. After Smith talked to Davis, a meeting was arranged between Davis and Butts that evening *205 in Atlanta. Butts told Davis that he wanted to sell the two businesses that he controlled in Athens, and that between Huddle and N & N there was some $60,000 to $80,000 worth of equipment. Butts wanted $6,000 for both businesses, including the equipment. At the conclusion of the meeting Davis agreed to go to Athens to look over the premises and equipment. A week or 10 days later Davis and his wife traveled to Athens to make an inspection. Davis concluded that the location was good, and that, if properly operated, the business could be successful, particularly if the two floors previously operated as two enterprises were combined into a single cafeteria operation. He evaluated the equipment as originally costing $60,000 to $80,000; that it was worth $30,000 to $40,000, properly utilized in a profitable operation; and that it was worth only about $6,000 to take out and sell. Before returning from Athens, Davis agreed with Butts and Newton, coowner with Butts in N & N, that Davis would buy the two businesses for $6,000. It was Davis' intention to reopen N & N utilizing both floors, including the area formerly operated by Huddle, and the equipment of both businesses. Some of Huddle's *206 equipment was to be transferred to a new cafeteria being opened by Davis at the courthouse in Atlanta (hereafter referred to as Courthouse Cafeteria). Davis planned to utilize Huddle to hold and operate the Courthouse Cafeteria. Upon returning to Atlanta from Athens, Davis consulted his attorney, Hershel Cole, with respect to the acquisition of the stock of the two corporations in Athens. Cole suggested that one of the corporations could be utilized in the Atlanta courthouse operation. Davis received the key and access to Huddle and N & N some 2 or 3 weeks prior to the formal closing of the transaction and began to transfer some of the equipment to Courthouse Cafeteria. On October 31, 1952, Davis closed the transaction wherein he purchased all of the stock (other than qualifying shares held one each by Davis' wife and lawyer) of Huddle and N & N and all right, title, and interest in a $57,000 note owed to Butts by Huddle, for a total consideration of $6,000. On this day Davis was accompanied to Athens by his accountant of many years, who examined the books of the two corporations. On the same day, upon his return from Athens, Davis, his wife, and his lawyer held a meeting of *207 the stockholders and directors of Huddle, who were the above three individuals. The minutes reflect their decision to have N & N operate a cafeteria in its former location in Athens and to take over the additional space formerly held by Huddle; to transfer a part of Huddle's fixtures to N & N; to utilize some of Huddle's other fixtures in the Atlanta cafeteria, which was to be operated under the trade name "Courthouse Cafeteria"; and to have Huddle "acquire the assets and assume the liabilities of the 'Courthouse Cafeteria' giving its demand note, presently without interest, for the net asset value to A. T. Davis." After Davis acquired Huddle and N & N, Huddle transferred the lease and sublease in Athens under which it had formerly been operating to N & N, transferred some of its equipment to N & N, sold to outsiders and scrapped other equipment, and moved to the Courthouse Cafeteria in Atlanta equipment worth between $2,000 and $3,000, if purchased new. [1] Huddle also acquired from Davis ownership of the Courthouse Cafeteria business, which was Huddle's only operation immediately after October 31, 1952. The business operations of Huddle in Athens were never reactivated by Davis. *208 A second meeting of the stockholders and directors of Huddle was held on December 13, 1952, and according to the minutes, a public accountant, in separating the assets of Huddle from those of N & N, had tentatively determined that as of February 28, 1952, Huddle's fixed assets, valued at cost, amounted to $67,282.32; and, with a reserve for depreciation of $32,108.14, the net fixed assets totaled $35,174.18. Also at this meeting, the officers of Huddle were authorized to issue a new demand, noninterest-bearing note for $57,667.87 to Davis to replace the note he had acquired from Butts; to sell part of Huddle's fixed assets in Athens to N & N at net book value; and to purchase from Davis the Davis Fine Food Cafeteria located on Houston Street in Atlanta for its book value, giving Huddle's presently noninterest-bearing demand note for the purchase price. The space for Courthouse Cafeteria in the Fulton County Courthouse in Atlanta had been leased by Davis, "d/b/a Davis Fine Food Cafeteria" prior to Davis' agreement *209 to acquire Huddle. Equipment for Courthouse Cafeteria had also been ordered prior to Huddle's purchase. Courthouse Cafeteria, on certain signs also identified as Davis Brothers Cafeteria, commenced operations under the ownership of Huddle on October 31, 1952, the day Davis acquired Huddle and also transferred Courthouse Cafeteria's assets and liabilities to Huddle. Huddle's name was not publicly displayed nor advertised in connection with the cafeteria. On January 1, 1953, Davis transferred from his ownership to Huddle a consistently profitable restaurant or cafeteria that he had been operating for 10 or 11 years at 3 Houston Street in Atlanta. Davis received from Huddle a noninterest-bearing demand note in the amount of the book value of the business. This cafeteria retained its name "Davis Fine Food Cafeteria." During 1954 and 1955, the only business locations of Huddle were the cafeterias in the courthouse and on Houston Street. Huddle, on its income tax return for the fiscal year ending February 28, 1954, reported gross sales of $367,220.23 and net income of $16,635.96, against which it claimed a net operating loss carryover of $32,431.99. For the fiscal year ending February 28, 1955, with *210 gross sales of $425,437.36, it reported net income of $22,658.21 and deducted therefrom $15,796.03, the balance of the loss carryover. Respondent determined the losses were unallowable under sections 122 and 129 of the Internal Revenue Code of 1939 and sections 172, 269, and 382 of the Internal Revenue Code of 1954. Ultimate Finding Davis' principal purpose in acquiring the stock of Huddle was to avoid income tax by securing the benefit of a deduction, credit, or allowance which he would not otherwise enjoy. Opinion The issue is whether petitioner, the Huddle, Inc., all of whose stock was acquired by Davis on October 31, 1952, and which took over the operation of cafeterias in Atlanta, Georgia, may deduct for its fiscal years ending February 28, 1954 and 1955, operating losses incurred by petitioner prior to the change in ownership of its stock in the snack bar and beer business conducted in Athens, Georgia. Respondent determined that the carryover losses were not deductible under sections 129 and 122, I.R.C. 1939, and sections 269 and 172, I.R.C. 1954. [2] We consider the deductibility of these losses under only sections 129 and *211 269, of those Codes, respectively, because we think the provisions of those sections are dispositive of the issue. The pertinent parts of section 129, I.R.C. 1939, and section 269, I.R.C. 1954, which for purposes of this case are the same, [3] provide that if any person acquires, directly or indirectly, control of a corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. This Court has considered the application of these provisions in connection with the acquisition of loss corporations in a number of recent cases. Thomas E. Snyder Sons Co., 34 T.C. 400 (1960), affd. 288 F. 2d 36 (C.A. 7, 1961); Urban Redevelopment Corporation, 34 T.C. 845 (1960), *212 on appeal (C.A. 4, Dec. 14, 1960); Army Times Sales Co., 35 T.C. 688 (Jan. 31, 1961); Baton Rouge Supply Co., 36 T.C. - (Apr. 10, 1961); and Temple Square Mfg. Co., 36 T.C. - (Apr. 12, 1961). In the Snyder case we accepted the reversal of our decision in British Motor Car Distributors, Ltd., 31 T.C. 437 (1958), by the Court of Appeals for the Ninth Circuit (278 F. 2d 392 (1960)) and held that section 129 applies to an "acquired" as well as an "acquiring" corporation and such holding was followed in each of the other cases cited above. This disposes of petitioner's first contention. It is apparent from reading the above cases, all of which were decided against taxpayers except Baton Rouge Supply Co., supra, that the issue is one of fact whether the "principal purpose" for acquisition of the loss corporation was for evasion or avoidance of tax. In this case petitioner claims that Davis' sole purpose in acquiring the stock of petitioner was to acquire its assets, including a lease, that the stock of petitioner was offered as a part of a "package deal" and was the only way Davis could acquire those assets, that Davis thought the "package" offered *213 at the price asked was a good buy, that this was the business purpose for Davis' acquisition of petitioner's stock, and that Davis knew nothing of the corporation's prior losses or how they might be used to advantage taxwise and had no purpose to gain a tax advantage at the time he bought the stock. Davis was the only witness presented by either party and his testimony is the only direct evidence concerning his purpose in acquiring the stock of petitioner and the circumstances under which it was acquired. On the other hand, we also have evidence pertaining to the situation of both Davis and the seller at the time the transaction was first discussed and finally consummated and of what was done with and by petitioner after the transaction was closed. As was said in Army Times Sales Co., supra, at page -: The judicial ascertainment of someone's subjective interest or purpose motivating actions on his part is frequently difficult. One method by which such ascertainment may be made is to consider what the immediate, proximate, and reasonably to be anticipated consequences of such actions are and to reason that the person who takes such actions intends to accomplish their *214 consequences. This reasoning is implicit in the Latin maxim "acta exteriora indicant interiora secreta," and in the more homely English adage "actions speak louder than words." We are concerned here with Davis' principal purpose in acquiring all of petitioner's stock at the time the transaction was closed - not with his purpose in entering into the entire transaction at the time he first discussed it with Butts and looked over the property. Of course his initial purpose in entering into the transaction might well have considerable bearing on his reasons for acquiring petitioner's stock but it is not necessarily determinative of his purpose in buying petitioner's stock. He may have had one purpose for entering into the transaction and another purpose in carrying it out in this manner. If Davis' principal purpose in acquiring petitioner's stock was to avoid tax by securing the benefit of a deduction he would not otherwise have enjoyed, sections 129 and 269 require disallowance of the deduction. Although Davis testified that his principal purpose in entering into this transaction and buying petitioner's stock was not to obtain a tax advantage, in our opinion, the surrounding circumstances *215 and what was done with petitioner immediately after the transaction was closed compel a different conclusion with respect to the acquisition of petitioner's stock. Compare Thomas E. Snyder Sons, Co., supra; Army Times Sales Co., supra. While Davis' original interest in this transaction may have been motivated by a desire to acquire a restaurant location in Athens and equipment at what he thought was a good price, we think he must have been aware of the losses previously incurred by petitioner and the possible tax advantages that might be gained therefrom by the time the transaction was consummated on October 31, 1952. We can find no real business purpose for Davis' acquisition of the stock of petitioner rather than the equipment itself, and the evidence indicates that the only real benefit he obtained by utilizing petitioner to operate his cafeterias in Atlanta was the claim to this operating loss carryover. Petitioner argues that the properties were offered to him as a "package deal" and that buying the stock of both corporations was the only way he could get the location and the equipment. However, Davis' testimony was to the effect that purchase of *216 the two corporations separately was just never discussed, and there is no evidence that he made any effort to buy the leases and assets themselves. It seems strange that a businessman of Davis' ability and experience would buy the stock of two obviously unsuccessful corporations, with all attendant possible liabilities, unless there was some good reason for doing it that way, rather than simply buying the assets and leases, particularly when the seller was most anxious to sell. Davis had no intention of continuing the business of Huddle. He planned to and did operate the restaurant in Athens in the name of N & N Cafeteria, Inc., and that company used the space formerly occupied by Huddle and most of the equipment. There is no evidence that Huddle carried with it any goodwill, particularly in Atlanta where it was used. In fact, the name was never advertised in Atlanta. Davis had a good reputation as a restaurant operator in Atlanta and the two cafeterias operated by Huddle were known as Davis cafeterias. In fact, petitioner's charter was amended in 1959 changing its name to "Davis House No. 1, Inc." Only a small part of the equipment owned by petitioner was moved to Atlanta for *217 use by petitioner in its cafeteria there. The lease for Courthouse Cafeteria in Atlanta had been granted to Davis personally and it was never transferred to petitioner. Another cafeteria in Atlanta which Davis had operated successfully as an individual was transferred to petitioner not long after Davis acquired petitioner's stock. Davis had consulted his attorney and his accountant before the transaction was closed. They held a meeting of petitioner's stockholders and directors immediately upon Davis' return from Athens after the closing, and petitioner opened the new cafeteria in Atlanta on the same day. The Athens lease was assigned and most of the equipment was transferred to N & N shortly thereafter. Advantage of the tax features of buying the corporate stock was taken immediately after the transaction was closed and the tax benefits, plus the possible savings of a few hundred dollars in forming a new corporation, appear to be about the only advantages that could be foreseen in buying the stock and using petitioner to operate the business in Atlanta. A further indication that Davis was tax conscious at the time he acquired petitioner is evidenced by the fact that he bought the *218 note petitioner owed to Butts and shortly thereafter had the corporation reissue the note to himself. Taking all these factors into consideration, we are not convinced that Davis' principal purpose in acquiring petitioner's stock and utilizing the corporation to operate his previously successful restaurant business in Atlanta was other than tax avoidance by securing the benefit of deductions, credits, and allowances which petitioner might be entitled to but which Davis would not otherwise have enjoyed. Respondent has determined that such was the purpose, and the burden is on petitioner to prove that determination wrong. Army Times Sales Co., supra.We do not think petitioner has done so by the testimony of Davis alone that he was not familiar with corporate taxes and had no tax avoidance motives in consummating the transaction in this manner. Consequently, sections 129 and 269 require disallowance of petitioner's prior years' operating losses in computing its taxable income for its fiscal years 1954 and 1955. Decision will be entered for the respondent. Footnotes
1. Equipment from N & N was also transferred to Atlanta, but it is not clear from the record whether that equipment is included in Davis' $2,000 to $3,000 estimate.↩
2. Both parties agree on brief that section 382, I.R.C. 1954↩, is not applicable in this case.
3. Subsection (c) of section 269↩, establishing certain presumptions, is not applicable here because the acquisition occurred prior to March 1, 1954.