HUYLER'S, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 83836. Filed August 30, 1962.

*Robert S. Ashby, Esq.,* and *Lester M. Ponder, Esq.,* for the petitioner.

*Robert E. Johnson, Esq.,* for the respondent.

PIERCE, *Judge:* Respondent determined deficiencies in the petitioner's income taxes for its fiscal years ended June 30, 1956 and 1957, in the amounts of $37,500 and $640,386.77, respectively.

The issues for decision are:

(1) Whether a corporation which had in 1952 and 1953 experienced substantial changes in its stockownership and in the character of its business—as the result of a chapter X bankruptcy reorganization, the discontinuance of its former business, and the taking over of a new type of business theretofore operated by another corporation—may, under section 172 of the 1954 Code and section 122 of the 1939 Code, carry over and deduct from its "postreorganization" income derived from the manufacture of aluminum and other metal products, certain net operating losses sustained during its "prereorganization" period in its former business of manufacturing candy and operating a chain of restaurants.

(2) Whether said corporation may carry over and deduct in a taxable year following its reorganization, a capital loss sustained in a year prior to said reorganization.

The only other issue raised by the pleadings (pertaining to the effect of a net operating loss sustained in the postreorganization period) is dependent on the decision of Issue 1; and any proper adjustment with respect thereto will hereinafter be made in the computation under Rule 50.

### FINDINGS OF FACT.

Most of the facts have been stipulated. The written and oral stipulations of facts, including all exhibits therein identified, are incorporated herein by reference.

The petitioner, Huyler's, is a New York corporation which had its principal office and place of business in Indianapolis, Indiana. Its income tax return for each of the taxable years involved was filed with the district director of internal revenue at Indianapolis.

The corporate charter of Huyler's, which has from time to time been extensively amended and restated, was originally issued by the State of New York in 1881. The corporation's business for a period of about 70 years following its incorporation, until about 1953, was that of manufacturing candy and operating a chain of restaurants.

In 1948, it and its subsidiaries had candy factories with a total capacity of 21,500,000 pounds of candy per year; and it also had 23 restaurants located in New York City and other cities in the eastern and midwestern sections of the United States.

Early in the year 1951, Huyler's experienced critical financial difficulties, due principally to failure to dispose of large inventories of candy which had been built up in anticipation of the preceding Christmas season. Following unsuccessful efforts to obtain additional working capital, it in April 1951 filed a voluntary petition in the United States District Court for the Southern District of New York, for an arrangement with creditors under chapter XI of the Bankruptcy Act. The debtor, Huyler's, was allowed to remain in possession of its business until September 1951, at which time a receiver was appointed. Then, on February 25, 1952, the chapter XI proceeding was dismissed, and the assets in the hands of the receiver were returned to the corporation. During the pendency of this chapter XI proceeding, all of Huyler's candy factories were sold; and Huyler's at no time thereafter engaged in the manufacture of candy. Also during the pendency of said court proceeding, certain of Huyler's restaurants were closed; so that at the end of said court proceeding, its only business was that of operating 11 remaining restaurants. In addition, during the pendency of said court proceeding, the receiver issued certain receiver's certificates for the purpose of obtaining cash for administration expenses; and these certificates constituted a first lien on all the properties of Huyler's.

On April 23, 1952, which was only about 2 months after the dismissal of the chapter XI proceeding, Huyler's filed another voluntary petition in the same District Court—this second petition being for a reorganization under chapter X of the Bankruptcy Act. Thereupon, the court appointed a trustee to take over and administer the business.

While the chapter X proceeding was pending, the trustee gave consideration to several plans for reorganization of the business, which had been submitted to him by various groups. He finally selected one of these plans which he presented to the court as a proposed plan of reorganization. This proposed plan was subsequently amended; was then, in its amended form, approved by the court and the other necessary parties in interest; and was put into effect on or about December 1, 1952. A summary of the principal effects of the adoption of this plan is as follows:

1. The charter of Huyler's, which as before stated had originally been issued in 1881, was extensively amended and restated; and the charter, as so revised, was continued in force for the reorganized business.

2. The interests of the holders of all of Huyler's previously issued and outstanding stock (consisting of 42,485 shares of first preferred stock; 29,000 shares of second preferred stock; and 700,000 shares of common stock—all having par value of $1 per share) were eliminated.

3. $250,000 of new capital was paid into the corporation, in cash, by three individuals (hereinafter called the "new interests"), in exchange for shares of new common stock and new debentures hereinafter mentioned.

4. New common stock, consisting of 100,000 shares of the par value of $1 each, was issued as follows:

(a) 48,000 shares (48 percent) to the "new interests," in partial consideration for their above-mentioned investment of new capital; and

(b) 52,000 shares (52 percent) to nominees for certain creditors, in whole or partial satisfaction of their claims.

5. $250,000 of new 5-percent debentures due December 31, 1955, were issued to the "new interests," in further partial consideration for their said capital investment.

6. About $360,000 of new 6-percent subordinated debentures due December 1, 1957, were issued, in part to the United States Government and certain States and localities in satisfaction of their claims for unpaid taxes, and in part to certain nongovernmental creditors in satisfaction of their claims.

7. All of Huyler's right, title, and interest in 4 of its 9 remaining restaurants (the trustee having disposed of 2 of the 11 restaurants which Huyler's had in operation at the inception of the chapter X proceeding) were assigned to a nominee of an individual creditor in partial satisfaction of his claims.

8. A restaurant-operating agreement was entered into by the reorganized Huyler's with a restaurant management corporation, under which the latter agreed to operate for a period of 2 years, the only five remaining restaurants which had not theretofore been disposed of.

9. Nine new directors were selected, of which six were named by the "new interests"; and also five new officers were selected, of which the president, two vice presidents and the secretary were from among the new directors selected by the "new interests."

Upon consummation of the above plan of reorganization in December 1952, title to all assets held by the trustee was vested in the reorganized Huyler's. The only remaining operating assets which Huyler's then had, were the five restaurants that were being operated for it by the above-mentioned restaurant management company.

These restaurants proved unprofitable however; and as a consequence, they were closed as follows: One restaurant was closed on December 31, 1952; three during 1953, and the last one on September 15, 1954. Huyler's never thereafter operated any restaurant.

On or about March 13, 1953, Huyler's bought all the issued and outstanding shares of capital stock of Basca Manufacturing Company, Inc., an Indiana corporation that is hereinafter more fully described. The purchase price of the Basca stock was $2,600,000 of which $240,000 was paid in cash at the closing; and the balance was to be paid over a period of about 10 years, through contract installments secured by specified liens and mortgages. The reason for purchasing this stock was that the stockholders of Basca refused to allow a sale of its assets; and therefore, Huyler's purchased the stock as a means for obtaining the assets. Immediately after the purchase of said stock, Huyler's completely liquidated the Basca company, took over its business, and dissolved that corporation. At the time of such acquisition of the Basca business, Gerald L. Canfield, who had been the majority stockholder and president of Basca, was employed as vice president of Huyler's to manage the former Basca business.

Basca, as before stated, was an Indiana corporation. It had been organized in 1934, and it had its principal place of business in Indianapolis. For about 12 years following its organization, its business had been that of manufacturing automobile mufflers and automotive replacement parts; but at the time it was taken over by Huyler's, it was engaged in manufacturing various aluminum products, and also shell projectiles under a contract with the United States Government. Basca's financial statement for the year ended December 31, 1952, showed net sales of over $5 million; net profits (exclusive of $70,000 of refundable Federal taxes) of approximately $67,300; and net assets per books of over $700,000. Its only outstanding shares of capital stock were 86 shares of common stock—of which 80½ shares were held by its president, Gerald L. Canfield, and of which the remaining shares were held by Canfield's sister and his attorney. As before stated, all of this stock, and shortly thereafter all of the going business of Basca, were taken over by Huyler's.

Subsequently on August 31, 1954, the "new interests" surrendered to Huyler's, in advanced redemption at par, all of their $250,000 of 5-percent debentures due December 31, 1955, which they had acquired from Huyler's in the reorganization. Also, in May and August 1954, the "new interests" sold for an aggregate price of $315,000, all of their 48 shares of Huyler's common stock which they likewise had acquired in the reorganization. Of said stock, 24,000 shares were sold to Canfield (who as before said, had been the majority stockholder and president of Basca) and to members of his family; and 24,000

shares were sold to Millard H. Pryor (who had been a director of Basca) and to members of his family and two trusts for his children. The results of all this disposition of debentures and stock by the "new interests" were, that said "new interests" received an aggregate of $565,000 for the $250,000 investment of new capital which they had paid in at the time of the reorganization; and that they thereupon ceased to have any financial interest in Huyler's.

In the fall of 1954, eight new directors were elected for Huyler's; and the above-mentioned Millard Pryor became the new president. Later, in 1957, Canfield replaced Pryor as president of Huyler's; and the latter then became chairman of the board of directors.

Huyler's, upon its acquisition of the going business of Basca, moved its principal office to Indianapolis, where the Basca manufacturing plant was located. Thereafter, its principal activities were as follows. For a period of about 18 months while its five remaining restaurants were being liquidated in the manner above described, it operated the Basca business as a division. Following such liquidation, its sole activity was the operation of Basca's former business from the Indiana plant. The principal products produced in its operation of the former Basca business were aluminum foil milk bottle caps, aluminum drinking cups, and artillery shells manufactured for the United States Government under the contract taken over from the Basca company. In June 1956, Huyler's completed its work on said Government shell contract; and at about the same time, it bought all of the capital stock of an Indiana corporation named Twigg Industries, Inc., which was engaged in manufacturing component parts for the aircraft industry. Shortly thereafter in August 1956, it likewise liquidated Twigg, took over its business, and dissolved that corporation. During the taxable years here involved, the manufacture of metal products continued to be Huyler's sole activity.

A summary of Huyler's profits and net operating losses for its fiscal years ended June 30, 1951 through 1955 (the amounts of which have been stipulated), is as follows:

| Fiscal year ended June 30— | Restaurant and candy operations | Basca division operations |
|---|---|---|
| 1951 | ($1,272,770.86) | |
| 1952 | (1,574,801.80) | |
| 1953 | (909,719.25) | $324,823.77 |
| 1954 | | 298,568.19 |
| 1955 | | (333,471.25) |

The amounts of net income which Huyler's derived from its metal-manufacturing business for the fiscal years ended June 30, 1956 and 1957, as reported on its Federal income tax returns for said years

(before any adjustment for claimed net operating loss carryovers), were $127,946.31 and $1,480,976.67, respectively.

On Huyler's income tax returns for its fiscal years 1956 and 1957, it claimed deductions for net operating loss carryovers from the years 1951, 1952, and 1953—which net operating losses had been sustained in the carrying on of its former business of manufacturing candy and operating a chain of restaurants. Also, in its 1956 return it claimed a deduction for a capital loss carryover of $4,893.94 from its fiscal years 1952 and 1953, which it had sustained from the sale of the stock of one of its former candy factories.

The respondent, in his statutory notice of deficiency for the fiscal years 1956 and 1957 here involved, disallowed said claimed deductions for net operating loss carryovers; and he also disallowed the claimed deduction for capital loss carryovers. His explanation for said disallowances was as follows:

(a) It is determined that the amounts * * * claimed as net operating loss deductions on your income tax returns for the fiscal years ended June 30, 1956 and June 30, 1957, are not allowable deductions under the provisions of Section 23(s) and 122 of the Internal Revenue Code of 1939 and Section 172 of the Internal Revenue Code of 1954 for the following reasons:

(a) You are not the same taxpayer within the meaning of section 122(b)(2)(B) of the Internal Revenue Code of 1939 for the purposes of carrying over against your income realized in the taxable years ended June 30, 1956 and June 30, 1957 from the manufacture and distribution of aluminum and metal products, net operating losses sustained by your predecessor in the conduct of a candy-making and restaurant business * * * for the taxable years ended June 30, 1951, June 30, 1952, and June 30, 1953, respectively.

* * * * * * *

(b) It is determined that the amount of $4,893.94 claimed as a short-term capital loss on your income tax return for the taxable year ended June 30, 1956 is not an allowable deduction because you are not the same taxpayer within the meaning of section 117(e) of the Internal Revenue Code of 1939 and section 1212 of the Internal Revenue Code of 1954 for the purpose of carrying over capital losses sustained in the taxable years ended June 30, 1952 and June 30, 1953 prior to the date you acquired the assets and business of Basca Manufacturing Company, Inc.

OPINION.

*I.*

The first issue for decision is this: Can the petitioner corporation carry over and deduct from its "postreorganization" income for the years 1956 and 1957, which it derived from the operation of a metal-fabricating business, certain net operating losses which it had sustained during its "prereorganization" years of 1951, 1952, and 1953, while it was engaged in a former business of manufacturing candy and operating a chain of restaurants?

1. Statutory provisions for the carrying forward and carrying back of net operating losses have, since the Revenue Act of 1918, been part of our Federal income tax system. The basic policy of such provisions has been to make available a method for "evening out" the peaks and troughs of the profit curve of a business having fluctuating gains and losses, under our system of annual accounting for income tax purposes. But over the years, the Congress, the courts, and the Internal Revenue Service have raised barriers to the use of such method, in various situations where its use was thought to be inconsistent with the policy underlying the loss carryback and carryover deductions.[1]

Earlier cases in the net operating loss carryover area appeared to place particular emphasis on what is sometimes referred to as the "entity concept." One of these earlier cases was *New Colonial Co.* v. *Helvering*, 292 U.S. 435 (1935). There, a taxpayer corporation had purchased and continued to operate the business of another corporation which had theretofore sustained a net operating loss. The Supreme Court there decided that the purchasing taxpayer could not carry over and deduct said net operating loss of its predecessor, on the grounds that the two corporations were distinct and separate entities, and that the Court could find nothing in the statute which would indicate an intention that the losses of one corporate entity should be deductible by a successor corporate entity. This case thus appeared to place primary reliance on the entity concept, and to hold that where there was a combination of two corporations, there could be no carrying over of losses of a prior corporate entity whose existence had terminated.

Subsequently, this entity concept was applied with increased emphasis by this Court, in the case of *Alprosa Watch Corporation*, 11 T.C. 240 (1947), wherein there had been a radical change both in the character and in the ownership of the business. There, a partnership, engaged in the business of importing watches, purchased the stock of a corporation which had been engaged in manufacturing gloves, and which had a net operating loss carry forward from the prior year. Shortly after such purchase, the new owners took over the corporate entity of the glove business, disposed of all the glove-manufacturing machinery, changed the name and location of the business, and thereafter caused the corporation to engage solely in the business of selling watches and other jewelry. This Court held that, since the corporate entity had not changed, the radical changes in the ownership and nature of the corporation's business would not prevent the continuing entity from carrying over and deducting against the profits from its

[1] See review of the history and development of the carryback and carryover provisions in 69 Yale L. Jn. 1201 (1960).

new jewelry business, the losses which had theretofore been sustained in the former glove-manufacturing business.

The above-mentioned "entity concept" appeared to remain inviolate until the decision of the Second Circuit in *Stanton Brewery, Inc.* v. *Commissioner*, 176 F. 2d 573 (1949). There the Court of Appeals (relying in part upon the Supreme Court's decision in *Helvering* v. *Metropolitan Edison Co.*, 306 U.S. 522 (1939), wherein it was decided that a corporation surviving a merger could deduct the unamortized discount on bonds issued by a preexisting subsidiary) held that a parent holding company which survived a statutory merger with its wholly owned subsidiary, should be regarded to be the same "taxpayer" as the corporate subsidiary which had disappeared. The Court of Appeals appeared to justify such decision on the policy ground of ameliorating an otherwise harsh tax consequence; but it also appeared to distinguish *New Colonial*, on the ground that in said case the transfer of assets was voluntary, whereas in the *Stanton* case the combination of corporations was consummated in accordance with a State merger statute under which the rights of the disappearing corporation were taken over by the surviving corporation through operation of law.

The result of these earlier cases was to create uncertainty in the application of the statutory provisions relating to net operating loss carryovers, so that neither the Government nor taxpayers could accurately predict the consequences of corporate changes. Survival of tax attributes appeared to depend primarily on the form of the transactions, and on the technical skill with which they were effected. Thus the "entity concept" theory tended to penalize taxpayers who were either poorly advised or who, for nontax reasons, found it necessary to extinguish the loss entity.

During this same period when the above cases were being litigated, Congress took note of the "trafficking" which was being carried on with respect to loss corporations, i.e.: The practice under which loss corporations were in many instances being bought up, primarily for the purpose of obtaining the benefit of their loss history for income and excess profits tax purposes. Accordingly, Congress in 1943 added a new section to the 1939 Code, section 129, which in substance prohibited the allowance of deductions to a successor corporation, in situations where control of another corporation had been acquired for the primary purpose of obtaining that corporation's losses for tax purposes. This legislative attempt to meet the situation did not, however, prove to be effectual. See S. Rept. No. 1622, 83d Cong., 2d Sess., p. 53.

It was against the background of the foregoing decisions and legislative actions that the Supreme Court in 1957 reentered the area with

its decision in the *Libson Shops* case which is hereinafter considered.

2. *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382, was a net operating loss carryover case which involved a merger of 17 corporations, and in which the facts were different from those in the instant case. Despite these differences, the importance of the case for present purposes is that the Supreme Court there gave renewed emphasis to the basic policy underlying the net operating loss carryover provision of the statute; considered it unnecessary to discuss the earlier cases based on the "entity concept," including those which we have above mentioned; and decided that an alternative position there presented by the Government was dispositive of the case, i.e.: That the carryover privilege is not available unless there is a "continuity of business enterprise"; and that a prior year's loss can be offset against the current year's income only to the extent that such income is derived from the operation of substantially the same "business" which produced the loss. The Court, in the course of its opinion, said:

> The requirement of a continuity of business enterprise as applied to this case is in accord with the legislative history of the carry-over and carry-back provisions. Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year.[5] * * * What [legislative] history there is suggests that Congress primarily was concerned with the fluctuating income of a single business.[6]
>
>    *        •        *        *        *        *
>
> * * * The availability of this privilege [of deducting carryover losses] depends on the proper interpretation to be given to the carry-over provisions. * * * We conclude that petitioner is not entitled to a carry-over since the income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses.[9] [Footnotes omitted.]

It is true that in the *Libson Shops* case, the Court appended a footnote, No. 9, in which it stated that it did not pass on situations like those presented in *Alprosa Watch Corporation, supra,* and certain other mentioned cases wherein a single corporate taxpayer was involved. But such situation has since been dealt with in several cases decided subsequent to *Libson Shops,* including *J. G. Dudley, Inc.,* 36 T.C. 1122, affd. 298 F. 2d 754 (C.A. 4); *Commissioner* v. *Virginia Metal Products, Inc.,* 290 F. 2d 675 (C.A. 3); *Mill Ridge Coal Co.* v. *Patterson,* 264 F. 2d 713 (C.A. 5), certiorari denied 361 U.S. 816; and *Willingham* v. *United States,* 289 F. 2d 283 (C.A. 5).

In the *Dudley* case, the stock of a dormant corporation with a history of sizable operating losses sustained in a business of operating a hosiery mill, was acquired by the proprietor of a heating, plumbing, and electrical contracting business. The purchaser transferred the assets of his contracting business to the corporation which he had

acquired; and thereafter this corporation sought to carry over and deduct from the income of its new contracting business, net operating losses which had theretofore been sustained in the prior hosiery business. We held that such deduction was not allowable, relying in part on the controlling effect of the principle of the *Libson Shops* case. In the course of our opinion, we said:

True it is that the factual situation in *Libson* differs from the one before us in that there was no continuing corporate charter in *Libson*, while here there was, and no merger here, while there was in *Libson*. Further, the Court in footnote 9 to *Libson* in commenting on cases which are similar to this one on their facts and on which petitioner relies, said [quoting the language of said footnote]:

\* \* \* \* \* \* \*

Nevertheless, we think the Supreme Court in *Libson* was looking beyond legal niceties and was persuaded by the substance of the transaction before it.

\* \* \* \* \* \* \*

If we apply the reasoning of the Supreme Court in *Libson*, we have here the kind of situation in which the losses of an abandoned business should not be allowed as a carryover to offset current profits of petitioner's new business. There has not been met here the "requirement of a continuity of business enterprise" such as would justify allowing petitioner to utilize its claimed loss carryover \* \* \*

The Court of Appeals for the Fourth Circuit, in affirming our above decision in the *Dudley* case, made the following statement which is here particularly apposite:

It is fantastic to suppose that Congress, in carrying out its purpose to lighten the burdens of the taxpayer incident to the annual accounting system by offsetting losses of bad years against profits of good years, should have intended to permit a corporate taxpayer under new ownership to offset the losses of an earlier unsuccessful enterprise against the gains of a totally different enterprise subsequently undertaken. \* \* \*

In the *Virginia Metal Products* case, which is another case decided subsequent to *Libson Shops*, the Court of Appeals for the Third Circuit took a similar position. It said in part:

we think *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382 (1957), is unmistakably decisive of this case. \* \* \*

The basis of the Court's decision is directly applicable to this case and we think leaves no doubt of what it meant. Mr. Justice Burton, for the Court, pointed out that the government was contending "that the carry-over privilege is not available unless there is a continuity of business enterprise." \* \* \* Then the opinion goes on to say that this requirement of continuity of business enterprise accords "with the legislative history of the carry-over and carry-back provisions." The Court cites the legislative history pointing out that the provisions were enacted to "ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years and to strike something like an average taxable income computed over a period longer than one year." \* \* \* That case is a stronger case for the taxpayer than the one before us. The shareholders remained the same

in these various Libson corporations. The same business was carried on after the merger as before. * * *

Since the Supreme Court said that was insufficient for the application of Section 122, this is an *a fortiori* case. Here there was no continuity of business and there was no continuity of ownership. The taxpayer's hopeful reliance upon footnote 9 on page 390 of the report of *Libson* is misplaced. The Supreme Court was simply confining its decision to the facts before it. But the thrust of that decision easily includes such a case as this. This result accords with what other circuits have been saying in applying the *Libson* decision. * * * [Citing cases.]

The decisions of the Fifth Circuit in *Mill Ridge Coal Co.* and *Willingham* are to the same effect as the above-mentioned decisions in *Dudley* and *Virginia Metal Products*. The decision in the *Willingham* case appears to be particularly significant in that there, as in the instant case, the corporation involved went through a chapter X bankruptcy reorganization.

3. As regards the present case, we think that the decision in *Libson Shops*, and the several other above-cited cases which have followed and applied that decision, require a decision for the respondent on the issue before us. Here, in the interval between the years when the net operating losses were sustained and the years when petitioner has sought to deduct such losses, there were radical changes in the ownership of the business, in the capital structure of the business, in the location of the business operations, in the management of the business, and in the type of the business and its products. We are convinced that, in such circumstances, there was no "continuity of business enterprise" within the meaning of said above-cited cases. Accordingly, deductions of the claimed net operating loss carryovers are not here allowable.

The petitioner has suggested that the "special limitations" of section 382(a) of the 1954 Code are here controlling; but we are satisfied that said section has no applicability here. That section, as expressly stated in the related section 394(b), applies its "special limitations" only to changes in ownership and changes in business occurring on or after June 22, 1954; whereas in the instant case, the pertinent changes in ownership and character of business occurred in 1952 and 1953, and thereby extinguished the usability of the loss carryover by the new "business," even prior to the time when said "special limitations" were enacted and became operative.[2]

We decide the first issue in favor of the respondent.

---

[2] At the trial herein, we granted an unopposed motion of the petitioner, which had the effect of excusing it from then presenting proof of facts relative to changes in the ownership of its stock occurring after June 22, 1954, which would be pertinent if the above-mentioned section 382(a) were applicable. In view of our above holding that said section is not applicable, it has become unnecessary to receive or consider such excused proof.

## II.

The second issue for decision is whether the petitioner corporation is entitled to carry over and deduct from its postreorganization income of the year 1956, a *capital* loss which it had sustained in its prereorganization period, in selling the stock of a candy factory that it had then been operating.

The petitioner did not, on brief, separately develop this point; and the respondent, on brief, took the position that the decision of the first issue (relating to the carryover of *net operating losses*) would be dispositive of this second issue (relating to the carryover of a *capital loss*). We agree with this position of the respondent. It is our opinion that the rationale of the *Libson Shops* case, and also that of the *Dudley, Mill Ridge, Virginia Metal Products,* and *Willingham* cases, preclude the deductibility of the claimed capital loss carryover here involved.

Moreover, in *Patten Fine Papers, Inc.* v. *Commissioner*, 249 F. 2d 776, affirming on this point 27 T.C. 772, the Court of Appeals for the Seventh Circuit applied the "continuity of business enterprise" principle of the *Libson Shops* case in disallowing deduction of a claimed capital loss carryover.

We decide this second issue also in favor of the respondent.

*Decision will be entered under Rule 50.*

