*Decisions will be entered under Rule 50.*

ARTHUR T. BECKETT AND GERTRUDE E. BECKETT, ET AL.,* PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 95309–95311. Filed December 20, 1963.

---

*Proceedings of the following petitioners are consolidated herewith: Frederick J. Federighi and Mary Helen Federighi, docket No. 95310, and Maxwell Hardware Co., a corporation, docket No. 95311.

*George N. Koster, Valentine Brookes, Paul E. Anderson,* and *Richard A. Wilson,* for the petitioners.

*Charles W. Nyquist,* for the respondent.

388

392

394

OPINION

Since the record in this case is voluminous and the testimony of the witnesses in many respects confusing and in some respects contradictory, we believe it well to state in summary our view of the reasons which motivated Bryan and Federighi to enter into the agreement of October 18, 1954, and the primary purpose of each of them for making this agreement before proceeding to discuss the issues raised by the parties. As of July 1, 1954, Bryan and his brother owned all the stock of a corporation which was operating primarily a retail and wholesale hardware business. The operation of this business had been unprofitable for many years and by 1954 Bryan had concluded that it was not feasible to make sufficient changes in the hardware business of this corporation to convert it into a profitable operation. For this reason he had decided to liquidate this business of the corporation, Maxwell Hardware, and had begun to take the necessary steps for this liquidation. Bryan wanted to proceed with the liquidation of the retail and wholesale hardware business and the use of any of the other corporate assets in such a manner as to obtain the highest possible value therefrom for himself and his brother as common stockholders of Maxwell Hardware.

Although the corporation was pressed for cash because of its unprofitable operations over a period of a number of years, the book value of its assets was such that the corporate book net worth was over $800,000. Bryan was aware that by liquidating Maxwell Hardware, its total assets would produce substantially more than the $500,000 which he felt to be the fair market value of the common stock of the corporation and therefore had no desire to dispose of that common stock. Since the corporation had a net operating loss carryover of over $1 million with no reasonable prospects of earnings over the succeeding 5 years either from the hardware business or any other business in which that corporation had been previously engaged sufficient to enable it to use this net operating loss, Bryan was anxious to find

some arrangement to profit from Maxwell Hardware's net operating loss to the advantage of the common stockholders of Maxwell Hardware. The corporation did not have available funds to enter into a new business and therefore needed additional capital for any new business venture. Bryan had discussed his problem with his banker, Coates.

Federighi and Beckett owned or had a contract to acquire raw land which they intended shortly to proceed to develop, having taken the preliminary steps to determinue that development into residential lots of the major portion of this real estate was feasible. They had also determined that they desired to develop the property through a corporation in order to limit their personal liability in connection with the development. Because of the hilly nature of the land substantially more in development expenditures would be required over the years during which it was contemplated that the development work would be done than the value of the undeveloped land. Beckett and Federighi were looking into an arrangement for developing this real estate in the most profitable manner feasible with a limitation on their personal liabilities in its development.

When Federighi was discussing his problems with his banker, Coates, the latter suggested that Federighi and Bryan might work out some arrangement. Federighi and Bryan decided that an arrangement whereby the development of the Bay-O-Vista land might be done through the corporate form of Maxwell Hardware was feasible, reserving to Federighi the control of the development of this land without unduly restricting Bryan in other activities with respect to Maxwell Hardware, and agreed that for the benefit of the net operating loss carryovers of Maxwell Hardware less whatever portion thereof might be needed to offset earnings of Maxwell Hardware other than from the development of the real estate, Federighi and Beckett were willing to pay 10 percent of the profits from the Bay-O-Vista development. Bryan and Federighi then had lawyers draw up an agreement which was to contain the necessary provisions: (1) To permit Bryan to continue in control of the business of Maxwell Hardware other than the development of the real estate, (2) to give Federighi control of the real estate development limiting the liability of Federighi and Beckett in connection therewith, (3) to provide a time limit after which Bryan could dissolve the corporation if he so desired or Beckett and Federighi could draw out their interest therein, (4) to protect Federighi and Beckett in retaining all but 10 percent of the real estate development profits and in receiving distribution in kind if Bryan decided to dissolve the corporation or close its real estate development operations or they decided to withdraw from the corporation after the agreed period, (5) to leave with the Bryans the equitable interest in the assets of the corporation other than those of

408

the real estate development, and (6) to insure that the manner of handling the transaction would be such that the net operating loss carryovers of Maxwell Hardware would be usable to offset profits from the real estate development in determining Federal income taxes.

It is respondent's position with respect to the case involving the individual petitioners that Beckett and Federighi entered into the arrangement with Maxwell Hardware solely for tax avoidance purposes, that the entire transaction was a sham, that in substance the Bay-O-Vista subdivision was owned throughout the years 1954 through 1958 by Beckett and Federighi as partners, and the income earned therefrom was in fact their income.

It is petitioners' position that the transaction was not a sham, that the facts do not support that it was a sham, that the transaction was entered into for a legitimate business purpose and not primarily for the purpose of avoidance of taxes, that in effect respondent is attempting to ignore the corporate entity of Maxwell Hardware insofar as the operation of its real estate department is concerned, and that the facts do not justify ignoring the corporate entity of Maxwell Hardware. Petitioners argue that the net operating loss deduction which had been sustained by Maxwell Hardware prior to October 18, 1954, was not the motivating fact which influenced Beckett and Federighi to enter into the agreement of October 18, 1954.

We have found that the primary purpose of Beckett and Federighi in entering into the agreement with Maxwell Hardware was to obtain the use of the loss carryover against profits from the development of the Bay-O-Vista tract. Federighi and Beckett both testified that they would have entered into this agreement had the net operating loss not been available. Since from the very beginning of negotiations all parties knew of the existence of the net operating loss, it is obvious that a statement by any witness of what he would have done had the net operating loss not been available is at best an opinion, and under the circumstances here involved is pure conjecture. It was the fact of Maxwell Hardware's losses that caused Coates to have Federighi and Bryan meet. Bryan in his testimony stated that he felt because of these losses he had an advantage in going into a profitable business. He did with some reservations state that he probably would have entered into the agreement even if Maxwell Hardware had not had the net operating loss carryover. Federighi never offered any rational explanation of the advantages that he thought resulted from the arrangement with Maxwell Hardware as distinguished from developing the Bay-O-Vista subdivision through one of the corporations which he and Beckett already owned or controlled or a corporation that might be formed by them. The logical explanation of the advantage Federighi expected to obtain was the use of the net operating loss carryover of Maxwell Hardware against expected earnings from the

development of the Bay-O-Vista property. Cf. *Weyl-Zuckerman & Co.*, 23 T.C. 841, affd. 232 F. 2d 214 (C.A. 9, 1956).

Federighi's statement that the credit of Maxwell Hardware would be valuable in the development of Bay-O-Vista is unconvincing in view of the evidence that Maxwell Hardware was not in a position to borrow on open account, that it was contemplated that the financing of the Bay-O-Vista development would be from the $200,000 paid in by Beckett and Federighi plus borrowings on the security of the land, and that Coates had already indicated that the bank would finance the project on such security. The reference to Maxwell Hardware's having once participated in a real estate development as a reason for having that corporation develop the Bay-O-Vista land is unconvincing in view of the remoteness of the time of that participation and the fact that no one in the employ of Maxwell Hardware in October 1954 had any experience in real estate developments.

No money from the hardware department of Maxwell Hardware was ever supplied to the real estate department, but the real estate department made transfers to the hardware department. The agreement of October 18, 1954, with respect to how the taxes were to be prorated in allocating the earnings of the hardware department and the real estate department of Maxwell Hardware shows that the parties all had in mind the benefits which would result from the net operating loss. No logical reason why Beckett and Federighi would be willing to let the common stockholders of Maxwell Hardware have 10 percent of the profits of the Bay-O-Vista development, except for the use of the net operating loss carryover, is shown by the record in this case. Cf. *Urban Redevelopment Corp.* v. *Commissioner*, 294 F. 2d 328 (C.A. 4, 1961), affirming 34 T.C. 845.

The conclusion that the primary reason why Beckett and Federighi entered into the agreement with Maxwell Hardware was to obtain the use of that company's net operating loss to offset the earnings of the Bay-O-Vista development does not dispose of the issue here present. The transfer of the property to Maxwell Hardware was by a legitimate deed, and the notes, though secured by the real estate, were notes of Maxwell Hardware that had the real estate not been sufficient security would have been a call if necessary upon the general assets of that company. The performance bonds were likewise given by Maxwell Hardware and the deeds to the property to the various purchasers were given by Maxwell Hardware. After the agreement of October 18, 1954, was entered into, Federighi acting as a vice president of Maxwell Hardware proceeded to have Bryan as president of the company sign many documents to obligate the company in all respects in the development of the Bay-O-Vista subdivision.

It is true as respondent points out that occasional documents appear in the name of Beckett and Federighi, primarily in situations where

some third party was mistaken as to the ownership of the Bay-O-Vista subdivision. In most instances Federighi had an employee of the partnership have a correction made on the document. It is also true that Federighi managed the real estate department with very little assistance from Bryan, other than Bryan's signing of various documents. We also recognize as respondent points out that in any case involving a question of whether the form of a transaction differs from its substance, the form of the transactions is likely to be in accordance with a plan to give the appearance of substance.

One of the major arguments of respondent centers upon the provision in the agreement of October 18, 1954, contained in paragraph 7, to the effect that the corporation agrees that it will not attempt to close up the real estate department for a 6-year period except upon the unanimous vote of the board of directors and the holders of the preferred stock agree that they will not sell their stock for such 6-year period and after the 6-year period if the holders of the preferred stock desire to sell their stock they must first offer it to the corporation and the "corporation in such event must redeem said stock" upon the terms thereafter set forth. The redemption terms basically are that in the event the net assets of the real estate department are greater than the aggregate par value of the preferred stock, the par value of the preferred stock shall be paid out of these assets and 90 percent of the excess distributed to the holders of the preferred stock, the distribution to be made insofar as possible in kind at book value from the assets of the department and in the remainder in cash on hand in the department. If the book value of all the net assets is less than the par value of all the outstanding preferred stock, then the total assets of the department are to be distributed ratably among the holders of the preferred stock. If after 6 years the corporation desires to close the department or acquire the preferred stock, the corporation may redeem the preferred stock in whole but not in part under the same terms as the holders of the stock are permitted after 6 years to require its redemption. There is in this provision also the exception that if anyone of the holders of the common stock should die prior to the expiration of the 6-year period, the corporation may redeem in whole but not in part. This agreement in effect provided for two businesses to operate as one corporation and 90 percent of the profits of one of those businesses to go to the holders of the preferred stock if that portion of the business were discontinued. In corporations generally upon dissolution all accumulated profits are distributed to the stockholders. Therefore, this provision does not, as respondent contends, show that the transaction was a sham. The provision, with the exception noted, requires the continuance of the real estate department for 6 years but does not provide that it must terminate thereafter.

Respondent refers to this part of the agreement of October 18, 1954, as providing for a "round trip" of the real estate such as was involved in *Weyl-Zuckerman & Co.*, *supra*. However, the instant case differs from *Weyl-Zuckerman & Co.*, *supra*, not only because it was contemplated that the real estate department of Maxwell Hardware would in fact develop and sell real estate from the Bay-O-Vista tract, but also because there was a real business purpose to having this development done by a corporation. Cf. *Southern Ford Tractor Corporation*, 29 T.C. 833 (1958). Under these facts the transfer of the property to Maxwell Hardware was not a sham. In calling this transaction a sham respondent is in effect contending that insofar as the real estate department is concerned, the corporate entity of Maxwell Hardware should be disregarded. It is well settled that taxation is a real matter and that transactions that are sham and unreal may be disregarded so that the income therefrom is taxable to the true earner thereof. *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422 (1949), and cases cited in footnote 20 thereof. However, where there is a business purpose in transferring property to a corporation and after the transfer the corporation uses the property in its business, the transaction is not sham or unreal. *Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943); *John F. Nutt*, 39 T.C. 231 (1962), on appeal (C.A. 9, July 11, 1963).

In the instant case Maxwell Hardware as a corporate entity entered into contracts for the borrowing of money to finance development of the Bay-O-Vista property. None of the notes was endorsed by any officer or stockholder of Maxwell Hardware. Maxwell Hardware executed deeds transferring property to various individuals. The corporation took other action with respect to the property as we have detailed in our findings. These actions certainly amount to business activity of a real nature. Under the facts here present we conclude that the corporate entity of Maxwell Hardware insofar as its real estate department is concerned cannot be disregarded for tax purposes even though the primary reason that Beckett and Federighi entered the agreement with Maxwell Hardware was to obtain benefits from that corporation's net operating loss carryover.

Although respondent in his notice of deficiency referred to section 482 of the Internal Revenue Code of 1954,[5] he does not argue the application of this section and in effect concedes that unless the transfer of the Bay-O-Vista land to Maxwell Hardware is considered a sham, section 482 is inapplicable in this case.

Since in our opinion the earnings from the Bay-O-Vista development are taxable to Maxwell Hardware during the years here involved, it is necessary for us to determine whether the net operating losses

---

[5] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

sustained by Maxwell Hardware prior to the establishment of the real estate department are properly to be used in the fiscal years ended January 31, 1957 to 1960, as a reduction in the taxable income of Maxwell Hardware from that department. In our view, were the provisions of the Internal Revenue Code of 1939 applicable to this case, Maxwell Hardware would not be entitled to deduct the net operating loss carryover. The facts simply stated are that Maxwell Hardware discontinued its hardware business on which it had sustained losses, issued some preferred stock to new stockholders, and with the payment received entered a real estate development business the profits of which were to go primarily to the preferred stockholders. There is no more "continuity of business enterprise" here than in *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382 (1957). In that case a number of corporations all owned by the same interests were merged. Prior to the merger some of the corporations had been operating at losses and others had been operating at profits. After the merger the businesses which had been operated by the corporations which had sustained losses continued to operate at losses and the businesses which had been operated by the corporations which had made profits continued to operate at profits. The court held that to allow the net operating loss carryovers of the businesses which had been loss operations to reduce the taxable income from other businesses which had been and continued to be profitable operations was contrary to the intent of the statute. Certainly if the premerger losses of one business cannot be averaged with the postmerger profits of another as held in *Libson Shops, Inc.* v. *Koehler*, *supra*, the "precombining" losses of a hardware business cannot be averaged with the "postcombining" profits of a real estate development business. Such an averaging does not comply with the intent of Congress to average "the fluctuating income of a single business."

In the *Libson Shops* case the continuing corporation was not the corporation that had sustained the losses. However, as we stated in *Julius Garfinckel & Co.*, 40 T.C. 870, 875 (1963), on appeal (C.A. 2, Nov. 15, 1963), "in many cases decided by this and other courts since the decision in *Libson Shops*, it has been held the doctrine of *Libson Shops* prevents the carry-over even though it is the loss corporation that is seeking to carry over its own pre-merger or preacquisition loss." While the precise facts here involved differ from those involved in *Julius Garfinckel & Co.*, *supra*, and each of the cases cited therein,[6] the principle that the carryover privilege is not available unless there is a "continuity of business enterprise" is equally applicable here. In

---

[6] Following our statement quoted from *Julius Garfinckel & Co.*, 40 T.C. 870, 875 (1963), are the following cases: *Mill Ridge Coal Co.* v. *Patterson*, 264 F. 2d 713; *Willingham* v. *United States*, 289 F. 2d 283; *Commissioner* v. *Virginia Metal Products, Inc.*, 290 F. 2d 675, reversing 33 T.C. 788; *J. G. Dudley Co.*, 36 T.C. 1122, affd. 298 F. 2d 750; *Huyler's*, 38 T.C. 773; *Norden-Ketay Corp.* v. *Commissioner*, 319 F. 2d 902, affirming a Memorandum Opinion of this Court.

*Huyler's* 38 T.C. 773 (1962), on appeal (C.A. 7, May 16, 1963), we discussed the development of the "entity concept" in determination of the use of net operating loss carryovers and concluded that such carryovers were not deductible unless there was a continuity of business enterprise even though the corporation seeking the deduction was the same legal entity that sustained the operating losses in the prior years. In *Huyler's, supra,* we stated at page 781, with respect to the entity concept, that:

The result of these earlier cases was to create uncertainty in the application of the statutory provisions relating to net operating loss carryovers, so that neither the Government nor taxpayers could accurately predict the consequences of corporate changes. Survival of tax attributes appeared to depend primarily on the form of the transactions, and on the technical skill with which they were effected. Thus the "entity concept" theory tended to penalize taxpayers who were either poorly advised or who, for nontax reasons, found it necessary to extinguish the loss entity.

In the recent case of *Federal Cement Tile Co.,* 40 T.C. 1028 (1963), we sustained respondent's disallowance of loss carryovers where the corporation seeking the carryover was the loss corporation which had acquired by merger the profitable different kind of business of another corporation. In *Federal Cement Tile Co., supra,* all the stock of the loss corporation had been sold to the owners of the stock of the profitable corporation shortly prior to the merger of the profitable corporation into the loss corporation. This same factual situation of a sale of all the stock of the loss corporation to the owners of a profitable business shortly before the acquisition of the profitable business by the loss corporation is present in a majority of the cases in which net operating loss deductions have been disallowed to the loss corporation because of there being no continuity of business enterprise in the activity which produced the profits. In some cases the owners of the stock of the loss corporation already owned a profitable business or stock of a corporation doing a profitable business and caused the loss corporation to acquire the profitable business. In some cases the owners of the stock of the loss corporation acquired the stock of a profitable business shortly before causing the merger of the profitable corporation into the loss corporation. In the instant case Beckett and Federighi who owned the land which they contemplated developing as a profitable business did not acquire any common stock of Maxwell Hardware. Neither the Bryans who owned all the common stock of Maxwell Hardware nor the corporation acquired the Bay-O-Vista land or any rights therein prior to October 18, 1954. From all the evidence in this case we are convinced that the combination of the potentially profitable business with the loss business was skillfully arranged in this manner in order that there would be no acquisition of control of a corporation by Beckett and Federighi or acquisition

by Maxwell Hardware of property of another corporation within the meaning of section 269. We think it clear that the provisions of section 269 are not applicable here because of the absence of the type of acquisition provided for therein. However, there appears to us to be no reason why the method whereby the different and profitable business was acquired by the loss corporation should control the issue of whether under the decision in the *Libson Shops, Inc.* case, the net operating losses sustained by the hardware business of Maxwell Hardware may properly be used to reduce the taxable income from the real estate subdivision. The holding in the *Libson Shops, Inc.* case was that the fact that section 129 of the Internal Revenue Code of 1939 (the predecessor of section 269) was inapplicable did not automatically entitle the taxpayer to the claimed carryover. In the *Libson Shops, Inc.* case the Code provision was inapplicable because the primary purpose of the acquisition was not tax avoidance, whereas in the instant case the provision is inapplicable because the nature of the acquisition does not come within the statute. However, the reason for the lack of applicability of the Code provision does not appear to be controlling. The final sentence of the Court's opinion in the *Libson Shops, Inc.* case is: "We conclude that petitioner is not entitled to a carry-over since the income against which the offset is claimed was not produced by substantially the same business which incurred the losses." Although only one corporation is involved in the instant case, the two departments are so unrelated as in substance to place two separate business entities into one corporate entity.

In the instant case the income against which the offset is claimed was not produced by substantially the same business which incurred the losses. Petitioners argue that the development of the Bay-O-Vista subdivision was not a new business for Maxwell Hardware. From the evidence we have found to the contrary. The evidence does not establish, as petitioners contend, that Maxwell Hardware had previously engaged in a subdivision development. The most favorable interpretation that can be placed on the evidence with respect to the development of Maxwell Park is that it was done by a subsidiary of Maxwell Hardware. However, even if the evidence did support petitioners' contention that Maxwell Hardware had during the late 1920's engaged in developing a subdivision, such a fact would not establish that the subdivision business was not a substantially different business from the hardware business which produced the net operating losses which petitioners claim should be offset against income from the Bay-O-Vista development. The latest year that is mentioned as the end of development of Maxwell Park is 1933, 17 years prior to the first year of a net operating loss here claimed as a carryover. Neither do we consider the fact that a subsidiary corporation of Maxwell Hardware through its fiscal year ended January 31, 1953, and Maxwell Hardware

thereafter (having acquired its subsidiary's assets upon the subsidiary's dissolution), engaged in the rental of two properties, shows, as petitioners contend, that the Bay-O-Vista development was substantially similar to the business engaged in by Maxwell Hardware prior to October 18, 1954. Under the facts of this case which we have set forth in some detail, we do not consider the holding of two pieces of property primarily for use in the business of a related corporation, but receiving a small amount of rental income from outside interests, to be substantially the same business as developing the Bay-O-Vista property. It might even be questionable whether the rentals of parts of these properties to outside interests during the period here involved prior to October 18, 1954, were of sufficient importance to constitute a business separate from the rentals for business use by the related corporations, but we need not consider this question. Certainly, this record fails to show that prior to October 18, 1954, outside rentals were other than incidental to the use of the property in the business of related corporations. If this case were governed by the provisions of the Internal Revenue Code of 1939, it is our view that *Libson Shops, Inc.* v. *Koehler, supra*, and the many cases which have applied the holding in that case, where there has been no change in the corporate entity claiming the deduction, would dispose of the issue here raised favorably to respondent.

Petitioners, however, contend that *Libson Shops, Inc.* v. *Koehler, supra*, and cases relying on the principle there announced are inapplicable where the change in the corporate structure or the nature of the corporate business occurred after the enactment of the Internal Revenue Code of 1954. Petitioners point to the statement in *Huyler's, supra*, that section 382(a) has no applicability to changes in ownership and changes in business occurring before June 22, 1954, and also to the discussion as to the applicability of the provisions of section 382(a)(1)(C) in *Goodwyn Crockery Co.*, 37 T.C. 355 (1961), affd. 315 F. 2d 110 (C.A. 6, 1963). Obviously, the statement in *Huyler's, supra*, is no indication whether the continuity of business enterprise requirement applied in *Libson Shops, Inc.* v. *Koehler, supra*, is inapplicable to corporate changes made after June 22, 1954. *Huyler's, supra*, merely states that the provisions of section 394(b) expressly provide that the special limitations of section 382 apply only to changes in ownership and business occurring on or after June 22, 1954.

In *Goodwyn Crockery Co., supra*, there is no discussion in either the opinion of this Court or of the Circuit Court of the "continuity of business enterprise principle" as laid down in the *Libson Shops, Inc.* case. The entire issue discussed in *Goodwyn Crockery Co., supra*, is whether within the meaning of section 382(a)(1)(C), that corporation after a change of stock ownership continued to carry on a trade or business substantially the same as that conducted before the change

of ownership. It may be that the same principles would govern the issue of whether the income against which the net operating loss deduction is claimed was produced by substantially the same business which incurred the losses as required by the holding in the *Libson Shops, Inc.* case and the issue of whether a corporation is carrying on "a trade or business substantially the same as that conducted before" the change of ownership within the meaning of section 382(a)(1). If such is the case, it might be that where the change in ownership provision of section 382(a)(1)(C) applied, the principle of the *Libson Shops, Inc.* case would be inapplicable since the statute now specifically provides the extent to which the net operating loss shall be disallowed under such circumstances. However, as petitioners themselves point out, the instant case does not fall within the provisions of either section 381 or 382.

We are not persuaded by petitioners' citation to legislative history that since the enactment of sections 381 and 382 the principle laid down in *Libson Shops, Inc.* v. *Koehler, supra*, has no application to net operating loss carryovers where all relevant transactions occur after June 22, 1954. In the first place it is to be noted that the *Libson Shops, Inc.* decision was rendered by the Supreme Court approximately 3 years after the enactment of the Internal Revenue Code of 1954 and even the decision of the District Court was not rendered until 1955. Furthermore, we think it clear as we noted in *Huyler's, supra* at 781, that the enactment of the detailed provisions of sections 381 and 382 of the Internal Revenue Code of 1954 was to prevent legal forms from controlling where a loss carryover would survive a reorganization and because the legislative attempt to avoid "trafficking" in net operating losses by the provisions of section 129 of the Internal Revenue Code of 1939 had proved ineffectual. In fact the very portion of the committee report quoted in petitioners' brief [7] shows that sections 381 and 382 were intended to remove the uncertainty as to when a net operating loss carryover would survive a corporate reorganization. As petitioners point out, respondent in his own rulings has stated that the principle announced in the *Libson Shops, Inc.* case does not apply to mergers which come within the provisions of sections 381 (a) and (c).[8]

---

[7] The following is quoted by petitioners from S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 52 (1954) :

"Present practice rests on court-made law which is uncertain and frequently contradictory. Your committee agrees that whether or not the items carryover should be based upon economic realities rather than upon such artificialities as the legal form of the reorganization.

"The bill provides for the carryover of these tax attributes or items from one corporation to another in certain tax-free liquidations and reorganizations. * * *

"The new rules enable the successor corporation to step into the 'tax shoes' of its predecessor corporation without necessarily conforming to artificial legal requirements which now exist under court-made law. * * *"

[8] Rev. Rul. 58–603, 1958–2 C.B. 147. Rev. Rul. 59–395, 1959–2 C.B. 475.

It appears that the type of statutory merger involved in *Libson Shops, Inc., supra,* is one of the circumstances in which section 381 specifically provides for survival of the net operating loss carryover. This, however, does not control the issue whether the principle of *Libson Shops, Inc.* is applicable to a case where no such tax-free reorganization as is referred to in section 381 has occurred.

Section 382 provides for the disallowance of the net operating loss deduction to the loss corporation itself in whole or in part in case of purchase of the stock of the loss corporation by unrelated persons in specified amounts or redemption of the stock where after such purchase or redemption the corporation substantially changes its trade or business. In the instant case no useful purpose would be served in discussing the various provisions in detail since it is clear that the issuance of the preferred stock to Beckett and Federighi does not come within any of these provisions. See *Fawn Fashions, Inc.,* 41 T.C. 205 (1963), for discussion of application of sections 269 and 382 to the factual situation there present. The problem is whether by specifying the various circumstances in section 382 in which net operating loss deductions would be disallowed in whole or in part where a change in stock ownership has occurred followed by a change in the corporate business, Congress intended to provide that in all other instances the loss corporation would be entitled to deduct its net operating loss carryover from earnings from a different business enterprise unless such deduction fell within the prohibition of section 269.

Certainly this question is not one which is free from doubt. It is further complicated by the fact that the *Libson Shops, Inc.* case was predicated largely on the fact that even though a corporation, the result of a merger, might technically be the same legal "entity" and to this extent the same "taxpayer" as all the merged constituent corporations, it was not the same "taxpayer" for the purposes of the net operating loss carryover where there was no continuity of business enterprise. In this respect it is to be noted that section 122(b) of the Internal Revenue Code of 1939 provided that if "the taxpayer" has a net operating loss it shall be a net operating loss carryover whereas the comparable section of the 1954 Code, section 172(b)(1)(B), merely provides that a net operating loss "shall be" a net operating loss carryover, the reference to "the taxpayer" being omitted. The omission of reference to "the taxpayer" in section 172(b) of the 1954 Code was mentioned in a footnote to the opinion in the *Libson Shops, Inc.* case. There is no indication in the committee reports with respect to section 172 of the Internal Revenue Code of 1954 that Congress viewed the wording of section 172 so as to omit the reference to "the taxpayer" to

be a substantive change.[9]  We do not consider that by this change in wording Congress intended to provide for one of the very evils the provisions of section 382 were intended to remedy, the "trafficking" in loss carryovers.[10]

Petitioners' theory that only in cases which fall directly within the provisions of section 382 or section 269 would the net operating loss carryover be denied to a taxpayer, would invite the well advised and technically skillful to "traffic" in net operating loss carryovers.  Since the provisions of sections 382 and 269 as to ownership changes are precise and definite, all that would be necessary would be to create a relationship such as that provided for in the instant case which brings in new capital, new stockholders, and a new business without falling precisely within any statutory proscription.  We cannot credit to Congress the issuance of an invitation to indulge in a practice which the stated purpose of the enactment is to control, the "trafficking" in net operating loss carryovers.  We therefore hold that under the particular facts of this case and the principle of the *Libson Shops, Inc.* case, Maxwell Hardware is not entitled to offset against the earnings of its real estate department in its fiscal years 1957, 1958, 1959, and 1960, the losses which its hardware business had sustained in prior years.  In so holding, we do not intend to establish a broad legal principle but merely to apply already established principles to an unusual factual situation.

*Decisions will be entered under Rule 50.*

---

[9] See H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. A56 (1954), where reference is made to only two substantive changes neither of which is this change in wording.  See also S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., pp. 31–32 (1954), and Conference Rept. No. 2543 to accompany H.R. 8300, pp. 30–31.

[10] Certainly the following statement in H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 42 (1954), in respect to sec. 382 does not indicate any such intent:

"This special limitation on net operating loss carryovers provides an objective standard governing the availability of a major tax benefit which has been abused through trafficking in corporations with operating loss carryovers, the tax benefits of which are exploited by persons other than those who incurred the loss.  It treats a business which experiences a substantial change in its ownership, to the extent of such change, as a new entity for such tax purposes."